Laurie A. BREWER, and Jodie Foster, individually and as parents and guardians of Jessica L. Haak, a minor, Plaintiffs–Appellees,

v.

The WEST IRONDEQUOIT CENTRAL SCHOOL DISTRICT, the Urban–Suburban Interdistrict Transfer Program, Monroe Number One Board of Cooperative Educational Services, Theresa J. Woodson, Gretchen Stephan and Marlene S. Allen, in their individual and official capacities, Defendants–Appellants.

Docket No. 99–7186.

United States Court of Appeals, Second Circuit.

Argued Sept. 30, 1999.

Decided May 11, 2000.

Jeffrey Wicks, Bansbach, Zoghlin, Wicks & Wahl, P.C., Rochester, NY, for Plaintiffs–Appellees.

Kevin S. Cooman, McConville, Considine, Cooman & Morin, P.C., Rochester, NY (Peter J. Weishaar, of counsel), for Defendants–Appellants.

Janell M. Byrd, NAACP Legal Defense and Educational Fund, Inc., Washington, DC (Elaine R. Jones, Theodore M. Shaw, Norman J. Chachkin, Dennis D. Parker, Victor A. Bolden, of counsel, New York, NY) submitted a brief for amicus curiae the NAACP Legal Defense and Educational Fund, Inc. in support of the Defendants–Appellants.

Bill Lann Lee, Acting Assistant Attorney General, United States Department of Justice, Washington, D.C. (Mark L. Gross, Rebecca K. Troth, of counsel) submitted a brief for amicus curiae the United States in support of the Defendants–Appellants.

Eliot Spitzer, Attorney General of the State of New York (Preeta D. Bansal, Solicitor General, Peter H. Schiff, Deputy Solicitor General, Denise A. Hartman, Nancy A. Spiegel, Assistant Attorney Generals, of counsel) submitted a brief for amicus curiae the State of New York in support of the Defendants–Appellants.

Before: MINER, PARKER and STRAUB, Circuit Judges.

Judge PARKER concurs in the majority opinion, and files a separate concurring opinion.

Judge MINER dissents in a separate opinion.

STRAUB, Circuit Judge:

Defendants, the West Irondequoit Central School District ("Irondequoit District"), the Urban–Suburban Interdistrict Transfer Program ("the Program"), Monroe Number One Board of Cooperative Educational Services ("Monroe Board")[1]

---

1. The correct name for this entity is the Board of Cooperative Educational Services, First Supervisory District of Monroe County.

and the individual defendants, appeal from an order entered on January 14, 1999, by the United States District Court for the Western District of New York (David G. Larimer, *Chief Judge*), granting the plaintiffs' motion for a mandatory preliminary injunction. *See Brewer v. West Irondequoit Central Sch. Dist.*, 32 F.Supp.2d 619 (W.D.N.Y.1999). The order directed the defendants to allow Jessica L. Haak, who was in the fourth grade at the time, to transfer from the Rochester City School District ("Rochester District"), her district of residence in Monroe County, New York, to the Iroquois Elementary School ("Iroquois") in the Irondequoit District, a neighboring suburban district in Monroe County, New York, pursuant to the Program as soon as possible, but no later than the start of the second semester or February 1, 1999. *See id.* at 635. The Program is a state-administered, interdistrict school transfer program, in which six school districts in New York State voluntarily participate primarily in order to attempt to reduce racial isolation within their boundaries, as is further explained below.

It is undisputed that, as administered, the Program only allows minority students to transfer from schools in the Rochester District to suburban schools, and only non-minority students may transfer from suburban schools to the Rochester District. The plaintiffs alleged in the District Court, as they do on appeal, that the denial of Haak's request to transfer to Iroquois under the Program on the ground that she is not a minority student violated her rights under the Fourteenth Amendment, and constituted discrimination under 42 U.S.C.

§ 2000d,[2] 42 U.S.C. § 1983, and New York Education Law § 3201.[3] The District Court granted the injunction and ordered Haak's transfer, expressing doubt that the defendants could demonstrate a compelling government interest, and that the Program was not narrowly tailored to serve such an interest in any event.[4] *See Brewer,* 32 F.Supp.2d at 632–33. At this stage in the proceedings, in light of the plaintiffs' heightened burden in seeking a mandatory injunction, we disagree on both accounts and, therefore, vacate the injunction and remand for a full trial on the merits.

## BACKGROUND

The Program operates and is funded pursuant to New York State legislative and State Educational Department ("SED") authorization. *See* N.Y. Educ. Law § 3602(36) (McKinney 1995); N.Y. Comp.Codes R. & Regs. tit. 8, § 175.24(1999) (the "Regulations"). The State funding replaced the Program's original federal funding under the Emergency School Aid Act of 1972, Pub.L. No. 92–318, Title VI, 86 Stat. 354 (1972), codified at 20 U.S.C. §§ 1601–1619, (repealed 1979). The Program is administered by the Monroe Board, described by the parties as a regional school district which provides or coordinates educational programs for the local school districts in Monroe County. The Irondequoit District is one of six school districts in Monroe County, New York, voluntarily participating in the Program.

The Program, one of the oldest voluntary desegregation efforts in the nation, is the only one of its kind in New York, and

---

**2.** Title 42, section 2000d of the United States Code prohibits discrimination in federally funded programs. Plaintiffs allege that The Monroe Board and the Irondequoit District are recipients of federal assistance.

**3.** Section 3201 of the New York Education Law (McKinney 1995) provides that "[n]o person shall be refused admission into or be excluded from any public school in the state of New York on account of race, creed, color or national origin."

**4.** Plaintiffs also asserted common law claims for breach of contract and promissory estoppel in their complaint, which the District Court concluded did not support issuance of a preliminary injunction because they did not meet the likelihood of success on the merits requirement for granting injunctive relief. *See Brewer,* 32 F.Supp.2d at 635 n.6. Plaintiffs are not challenging that determination on appeal.

one of only two or three such voluntary programs in the United States. The Program has its origins in a 1965 cooperative desegregation effort between the Rochester District and the Irondequoit District, "to reduce, prevent and eliminate minority group isolation in the schools of Rochester and Monroe County through voluntary desegregation." The Program arose in light of racial segregation within the Rochester District, a problem recognized by the SED, the Rochester District school board and superintendent, and the public at large.

Currently, the Program has several stated goals, expressed in various documents relating to the Program. For example, the Program's Mission Statement identifies as its goals the following: "Reducing Minority Group Isolation; Encouraging Intercultural Learning; Promoting Academic Excellence; Fostering Responsible Civic Leadership." Although the plaintiffs emphasize the differing stated goals of the Program, and the District Court acknowledged those, see Brewer, 32 F.Supp.2d at 621, the court also made a finding that "it is clear that the main purpose of the Program is to reduce what is described as 'racial isolation' within the population of the participating school districts." Id. As the District Court stated, "[i]n other words, the program is designed to reduce the percentage of minority students in predominately minority city schools, and to increase the percentage of minority students in predominately white suburban schools." Id. See also N.Y. Educ. L. § 3602(36)(a) (stating that the Program is "designed to reduce racial isolation").[5]

"Racial isolation" is defined by the Regulations as existing when "a school or school district enrollment consists of a predominant number or percentage of students of a particular racial/ethnic group." N.Y. Comp.Codes R. & Regs. tit. 8, § 175.24(a)(2) (1999). Accordingly, the districts that voluntarily participate in the Program must demonstrate each year that implementation of the Program "will reduce racial isolation by transferring minority pupils, nonminority pupils or both on a voluntary basis between participating urban and suburban districts." N.Y. Comp. Codes R. & Regs. tit. 8, § 175.24(c)(1) (1999).

As the Program is currently administered, only minority pupils are allowed to transfer from "predominantly minority city schools" to participating suburban schools, and non-minority students may transfer from suburban schools to city schools provided that their transfers "do not negatively affect the racial balance of the receiving school." The phrase "racial balance" is not defined in the Program's literature. Although the Regulations define a "minority pupil" as "a pupil who is of Black or Hispanic origin or is a member of another racial minority group that historically has been the subject of discrimination," N.Y. Comp.Codes R. & Regs. tit. 8, § 175.24(a)(1) (1999),[6] neither the Program application, nor the acknowledgment letter sent to the parents who apply, nor the Program brochures, contain any reference to the student's race or ethnicity. The defendants assert that according to the "usual practice," a parent who makes the initial inquiry about the application process by telephone is advised of the minority pupil requirement, although Haak's mother claims that she was not told of this requirement. Parents are expected to "self-screen" their children. In addition, the defendants state that once the applicant is met in person by a Program Administrator, a question may be raised as to the student's race as a result of the student's "name, manner of speech and phrasing, and personal appearance of the child

---

5. We emphasize that we frame our discussion of the Program as primarily aimed at reducing racial isolation based on the District Court's explicit finding that this is its "main purpose."

6. The defendants include students of Asian and American Indian origin as minorities historically the subject of discrimination.

as observed during an interview or orientation meeting."

The undisputed evidence before the District Court also shows that for the 1998–99 school year, approximately 580 students attended schools in the participating suburban school districts via the Program. Approximately 67 of those students were newly selected for that school year, the other 513 continued from prior years. With the exception of Haak, none of the students who were accepted into the Program for transfer that year to the suburban school districts is a non-minority pupil within the SED definition. Haak, who is white, was initially accepted into the Program for transfer in July 1998. Her acceptance was acknowledged in writing even after she had been seen in person by Iroquois's Assistant Principal. However, her acceptance was revoked after another administrator became concerned that Haak was not a minority pupil when she saw Haak in person and verified her race as Caucasian/White in the Rochester District records.

Statistics show that the concentration of minority students in the Rochester District has increased over the last 35 years (from 25 percent in 1963 to 80 percent in 1977), despite the Program's efforts. For the 1996–97 school year, for example, the suburban districts reported an overall minority student population of less than ten percent while the Rochester District reported a minority student population of about eighty percent. The Rochester District reported that 591 minority students had been transferred during that year to participating suburban schools and 29 white students had been accepted into the Rochester District from suburban schools, yet, the number of transferring students has varied over the years of the Program's operation, with as many as 200 suburban and 1,100 city students transferring in 1982–83.

## DISCUSSION

The District Court granted the plaintiffs' motion for a preliminary injunction on the grounds that denial of Haak's request to transfer to the participating suburban districts under the Program violated her equal protection rights. *See Brewer,* 32 F.Supp.2d at 634. The defendants and their *amici* raise several arguments that they contend warrant reversal of the District Court's decision and denial of the injunction. They primarily contend that the plaintiffs will suffer no irreparable harm if the injunction is denied, and that the plaintiffs are not likely to succeed on the merits. They argue that under the strict scrutiny analysis that applies to the challenged program, reducing racial isolation is a compelling government interest and, second, assuming that this is a constitutionally permissible goal, there is no alternative means by which to achieve it. On the narrow issue presented to us, namely, whether the plaintiffs have satisfied the heightened burden for issuance of a mandatory injunction, we vacate and remand for a trial on the merits.

## I. *Standard of Review and Standard for Issuance of a Mandatory Preliminary Injunction*

We review the preliminary injunction for an abuse of discretion, which we will find if the district court made an error of law or fact. *See Molloy v. Metropolitan Transp. Auth.,* 94 F.3d 808, 811 (2d Cir.1996). Where, as here, the district court makes the requisite findings based solely on a written record, we review the record *de novo* because we are in as good a position as the district court to read and interpret the submitted materials. *See Innovative Health Sys. v. City of White Plains,* 117 F.3d 37, 43 (2d Cir.1997).

In most cases, a party seeking a preliminary injunction must demonstrate (1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make them a fair

ground for litigation, and a balance of hardships tipping decidedly in its favor. *See Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144, 149 (2d Cir.1999). In some cases, a significantly higher standard applies. The moving party must make a "clear" or "substantial" showing of a likelihood of success in two instances: where (1) the injunction sought is mandatory, *i.e.*, "will alter, rather than maintain, the status quo"; or (2) the injunction sought "will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir.1996) (internal quotation marks omitted).

■■■ There is no dispute that the injunction at issue is a mandatory one. First, Haak will be allowed to transfer to a school outside her district of residence without paying tuition, which she would not otherwise be entitled to do absent the Program. *See* N.Y. Educ. Law § 3202(1) (McKinney 1995). Second, although plaintiffs contend that they challenge the Program only as applied to Haak, it is clear that survival of the Program is at stake in this case; the Program will necessarily lose its funding if it allows nonminority students, such as Haak, to transfer from the city to the suburban school districts, as the participating school districts must demonstrate on a continuing basis that their implementation of the Program will "reduce racial isolation." *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 175.24(c)(1) (1999). Thus, because the requested relief will alter the status quo as it existed prior to the grant of relief, it is properly characterized as mandatory. *See Jolly*, 76 F.3d at 474; *Beal v. Stern*, 184 F.3d 117, 123 (2d Cir.1999) (preliminary injunctive relief sought is "mandatory" where relief sought "at its broadest" will eliminate policy being challenged). This heightened standard for mandatory relief is applicable to the moving party's showing even where, as here, the nonmoving party bears the burden at a trial on the merits. *See, e.g., Jolly*, 76 F.3d at 474, 477 (explaining that the movant must make a "clear" or "substantial" showing for the requested mandatory injunction and evaluating the defendants' showing of a compelling government interest in a religious discrimination claim).

## II. *Irreparable Harm*

Defendants first argue that the plaintiffs will not suffer irreparable harm if preliminary relief is denied. The District Court based its decision that the plaintiffs had demonstrated irreparable harm on our holding that "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Brewer*, 32 F.Supp.2d at 625 (internal quotation marks omitted) (quoting *Bery v. City of New York*, 97 F.3d 689, 694 (2d Cir.1996)) (collecting cases). While acknowledging this general principle, defendants contend that it is not applicable where, as here, the constitutional violation alleged is distinct from a First Amendment violation for "which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief." *Air Transport Int'l, LLC v. Aerolease Fin. Group, Inc.*, 993 F.Supp. 118, 125 (D.Conn. 1998) (internal quotation marks omitted). Defendants do not, however, provide any support for the proposition that an equal protection violation is not also difficult to compensate monetarily, nor do we see any justification for such a rule.

■■ In fact, while it may be true that the majority of cases in which we have based an irreparable harm finding on the alleged deprivation of a constitutional right have arisen in the First Amendment context, we have also found irreparable harm in the allegation of Fourth Amendment violations, *see Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir.1992), and Eighth Amendment violations, *see Jolly*, 76 F.3d at 482. Therefore, to the extent that defendants suggest that only alleged First Amendment violations give rise to constitutional

claims for which monetary compensation would be insufficient, this is clearly incorrect.

Defendants further note that we have previously declined to grant a preliminary injunction with respect to school admissions because "[o]rdinarily a one-year delay in obtaining admission to a graduate school for the purpose of pursuing professional studies, as distinguished from interruption or termination of attendance already in progress, is insufficient to warrant an injunction in the absence of other circumstances militating in favor of such relief." *Doe v. New York Univ.,* 666 F.2d 761, 773 (2d Cir.1981). *Doe* is inapposite. First, *Doe* did not involve the allegation of a constitutional deprivation, but was a claim under the Rehabilitation Act. *See id.* at 765. Moreover, what defendants fail to acknowledge, and what further distinguishes this case from *Doe,* is that Haak had been admitted to Iroquois before she was told that she could not go. While it is true that Haak would not have been denied her right to a public education had the injunction not been granted, and her school attendance was not interrupted, the unique and somewhat outrageous facts of this case, in which a fourth grader is not once, but twice, told that she can attend a certain school and then that offer is later withdrawn, distinguishes this case—at least in the irreparable harm context—from one where a gainfully employed applicant merely experiences a one-year delay in obtaining admission to graduate school. *See id.* at 773.

■ Thus, we agree with the District Court that the plaintiffs have met their burden of showing irreparable harm because the deprivation alleged involves a constitutional right.

## III. *Likelihood of Success On The Merits*

■ Strict scrutiny applies to all government classifications based on race. *See Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 225–26, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). In order to survive strict scrutiny, the challenged classification must serve a compelling government interest, and be narrowly tailored to further that interest. *See id.* at 227, 115 S.Ct. 2097.

### A. *Compelling Government Interest Analysis*

#### 1. *The Central Purpose of the Program*

■ The District Court concluded that the central purpose of the Program is to reduce racial isolation in the participating schools. *See Brewer,* 32 F.Supp.2d at 621. Based on the written record before us, we agree that this is the central purpose of the Program. *See, e.g.,* N.Y. Educ. L. § 3602(36)(a). The District Court identified several reasons proffered by the defendants as to why the Program's primary goal of reducing racial isolation is a compelling one: (1) "preparing students to function in adult society, in which they will encounter and interact with people from many different backgrounds"; (2) "mak[ing] students more tolerant and understanding of others throughout their lives"; and (3) "eliminating *de facto* segregation." *Brewer,* 32 F.Supp.2d at 627. Curiously, however, the District Court concluded that the defendants "do not contend that [*de facto*] segregation exists within any of the individual participating school districts," *id.,* and, accordingly, seems not to have made any findings as to whether *de facto* segregation was present in the participating school districts.

In fact, the defendants do contend that *de facto* segregation is present, but apparently failed to sufficiently articulate this argument below. Based on our examination of the record, it is reasonable to conclude that the defendants did not press this point in the District Court as a result of their belief that the plaintiffs did not contest that reducing racial isolation is a compelling state interest and, therefore,

that the compelling interest question was not an open one to be decided by the court. See Jt.App. 443 (statements by the defendants that "[w]e don't have to get into the whole issue of whether or not there's a compelling interest, because that is conceded in this case," that were never challenged by the plaintiffs). While we have no doubt that the District Court was required to assess the constitutionality of the Program's goals for itself, we cannot clearly conclude on the record before us that *de facto* segregation, as we and other courts have defined it, does not exist in the participating school districts.

There is no question that New York State structures its public school system such that each student has only the right to attend the school in the district in which he or she lives. See N.Y. Educ. Law § 3202(1) (McKinney 1995). Moreover, the evidence in the record indisputably shows that the Program was enacted in 1965 to deal with racial segregation in the Monroe County schools resulting from this policy in combination with segregated living patterns, a problem labeled *de facto* segregation by the SED, the Rochester District school board superintendent, and the public at large. In urging districts within Monroe County to participate in the Program, for example, the Rochester District Superintendent warned that "any steps taken within the city alone may turn out to be temporary in nature due to the rapid growth in the non-white population which has taken place and is continuing to take place within the city." Jt.App. 183–84. *Cf. Strippoli v. Bickal*, 42 Misc.2d 475, 477, 248 N.Y.S.2d 588, 591 (N.Y.Sup.Ct.) (describing the Rochester District, as it existed in 1964, as racially segregated "[b]y reason of fortuitous residence pattern and population changes over the years" called "*de facto* segregation"), *rev'd on other grounds*, 21 A.D.2d 365, 250 N.Y.S.2d 969 (4th Dep't 1964) (holding that the Rochester District should be allowed to transfer minority students from one school to another to "reduce to some extent the racial imbalance existing in the

public schools"). The evidence also clearly shows that racial segregation in the participating school districts has progressively increased over the years.

Based on the record, we believe there is a substantial question as to the existence of *de facto* segregation in the participating school districts in Monroe County, such that the defendants should be given an opportunity during a full trial on the merits to address this factual issue, particularly given the apparent confusion over the status of the issues to be decided by the District Court. See *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 17–18, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (*de facto* segregation is present "where racial imbalance exists in the schools but with no showing that this was brought about by discriminatory action of state authorities"); *Parent Assoc. of Andrew Jackson High Sch. v. Ambach*, 598 F.2d 705, 712–13 (2d Cir.1979) (affirming a district court's finding that, what panel labeled *de facto* segregation of the school, "resulted from population changes" in the surrounding neighborhoods); *Arthur v. Nyquist*, 573 F.2d 134, 146 (2d Cir.) ("We assume that mere inaction, without any affirmative action by the school authorities, allowing a racially imbalanced school to continue, would amount only to *de facto* rather than *de jure* segregation"), *cert. denied*, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978); *NAACP v. Lansing Bd. of Educ.*, 559 F.2d 1042, 1045 (6th Cir.) (defining *de facto* segregation as resulting from "factors, such as residential housing patterns, which are beyond the control of state officials"), *cert. denied*, 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977).

Further, as detailed by the discussion that follows, we cannot conclude that the plaintiffs have met their burden in demonstrating a clear likelihood of success on the merits: serious questions exist as to whether the goal of the Program as defined above—reducing racial isolation in order to ameliorate arguably *de facto* seg-

regation—serves a sufficiently compelling government interest to justify use of a racial classification. *Cf. Beal*, 184 F.3d at 128–30 (holding that the appellants had not shown a "clear" likelihood of success in an application for a mandatory injunction where the record was unclear as to the discretion afforded to the Commissioner of the New York City Department of Parks and Recreation in a First Amendment challenge to Parks Department rules and there was insufficient evidence to determine whether the means chosen for the regulation were narrowly tailored); *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir.1996) (affirming a grant of a mandatory preliminary injunction where the "plaintiff had a high likelihood of establishing at trial that the defendants' enforcement" of the policy at issue "does absolutely nothing to advance a compelling interest" and it was "clear" that the defendants' enforcement did not and could not further the proffered compelling reason (internal quotation marks omitted)).

### 2. *Reducing De Facto Segregation as a Compelling Government Interest*

Relying largely on the Fifth Circuit's decision in *Hopwood v. Texas*, 78 F.3d 932 (5th Cir.), *cert. denied*, 518 U.S. 1033, 116 S.Ct. 2580, 135 L.Ed.2d 1094 (1996), the District Court concluded that remedying past wrongs by the governmental entity at issue is the only compelling state interest to justify racial classifications. *See Brewer*, 32 F.Supp.2d at 631 ("What emerges from the case law ... is the principle that classifications based SOLELY on race, in the absence of past identifiable governmental discrimination, are almost—if not absolutely—never permissible") (citing *Hopwood*, 78 F.3d at 944)). Because the racial isolation at issue here was not caused by any identifiable past discrimination by the school boards of the participating districts, the District Court suggested it might not be compelling. *Id.*

However, notwithstanding the Fifth Circuit's holding in this regard, there is much disagreement among the circuit courts as to whether this is, in fact, the state of the law under current Supreme Court jurisprudence. As the First Circuit has recently acknowledged, "[t]he question of precisely what interests government may legitimately invoke to justify race-based classifications is largely unsettled." *Wessmann v. Gittens*, 160 F.3d 790, 795 (1st Cir.1998); *see also McNamara v. City of Chicago*, 138 F.3d 1219, 1222 (7th Cir.) (observing that the question of whether there may be compelling interests other than remedying past discrimination remains "unsettled"), *cert. denied*, 525 U.S. 981, 119 S.Ct. 444, 142 L.Ed.2d 398 (1998). The confusion stems from the absence of a clear majority of the Supreme Court on this issue.

In *Regents of the Univ. of Calif. v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), Justice Powell expressed his view that absent prior *de jure* discrimination, diversity may be a permissible goal, but race may only be used in an admissions program as one factor among others. *See id.* at 311–12, 315, 318, 98 S.Ct. 2733. Four justices concurred in the view that race may be considered in an admissions program, and further suggested that race-conscious policies may be used to increase representation of minorities on college campuses, even without specific findings of past discrimination by governmental bodies. *See id.* at 296 n. 36, 365–66, 369, 98 S.Ct. 2733. The other four justices concurred in the judgment that the admissions program was invalid but on statutory, rather than constitutional grounds. *See id.* at 411–12, 421, 98 S.Ct. 2733.

Thereafter, in *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), the Supreme Court addressed the constitutionality of the use of racial quotas in teacher employment by local school authorities pursuant to an agreement reached with the local teachers'

union. It was in the context of addressing the school board's power to adopt a race-based layoff program affecting its own work force that the *Wygant* plurality indicated that the Equal Protection Clause required "some showing of prior discrimination by the governmental unit involved," *id.* at 274, 276, 106 S.Ct. 1842 ("Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy."); *accord id.* at 288, 106 S.Ct. 1842 (O'Connor, J. concurring in part and concurring in the judgment). *But see id.* at 286, 106 S.Ct. 1842 ("nothing the Court has said today necessarily forecloses the possibility that the Court will find other governmental interests which have been relied upon in the lower courts but which have not been passed on here to be sufficiently ... 'compelling' to sustain the use of affirmative action policies") (O'Connor J., concurring).

*Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), is to the same effect. Relying largely on *Wygant,* the Court held that a set-aside program in the construction industry could not be justified where there was "[no] identified discrimination in the Richmond construction industry." *Id.* at 505, 109 S.Ct. 706. *Croson* indicates that "a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Id.* at 498, 109 S.Ct. 706. However, *Croson* does not reach the issue of whether a non-remedial purpose could constitute a compelling government interest, because the classification at issue in *Croson* was only defended as necessary to remedy past discrimination. *See Wittmer v. Peters,* 87 F.3d 916, 919, 921 (7th Cir.1996) (stating that "there is a reason that dicta are dicta and not holdings, that is, are not authoritative" and thus concluding that "[a] judge would be unreasonable to conclude that no other consideration except a history of discrimination could ever warrant a discriminatory measure unless every other consideration had been

presented to and rejected by him" and holding that effective management of a prison boot camp justified a race-conscious hiring by the prison), *cert. denied,* 519 U.S. 1111, 117 S.Ct. 949, 136 L.Ed.2d 837 (1997).

While this Supreme Court precedent, admittedly, provides fairly strong support for the District Court's conclusion that there is no compelling interest in the Program here, there are two fatal flaws in relying on it, given the procedural posture of the case. First, the Fifth Circuit is the only circuit since *Bakke* to hold that a non-remedial state interest, such as diversity, may never justify race-based programs in the educational context. *See Tuttle v. Arlington County School Bd.,* 195 F.3d 698, 704 (4th Cir.1999), *cert. dismissed,* —— U.S. ——, 120 S.Ct. 1552, 146 L.Ed.2d 364 (2000); *Wessmann,* 160 F.3d at 795 (both recognizing this fact). Indeed, several circuits have opted not to rely on the lack of a compelling state interest in rendering decisions on related issues, due to the lack of clear Supreme Court precedent, *see, e.g., Eisenberg v. Montgomery County Pub. Schs.,* 197 F.3d 123, 130 (4th Cir. 1999) ("[W]hether diversity is a compelling interest remains unresolved" and so assuming without deciding that it may be compelling), *cert. denied,* —— U.S. ——, 120 S.Ct. 1420, 146 L.Ed.2d 312 (2000); *Tuttle,* 195 F.3d at 704–05 (same); *Wessmann,* 160 F.3d at 796 (concluding that it "need not definitively resolve this conundrum today" and deciding the case on alternative grounds); *Lutheran Church–Missouri Synod v. Federal Communications Comm'n,* 141 F.3d 344, 354, 356 (D.C.Cir.1998) (commenting that it did "not think diversity can be elevated to the 'compelling' level," but striking down the challenged regulation as not narrowly tailored), and some courts continue to accept race-based schemes that are not linked to remedying past discrimination by the governmental entity at issue, *see, e.g., Hunter v. The Regents of the Univ. of Calif.,* 190 F.3d 1061 (9th Cir.1999) (holding that Cali-

fornia had a sufficiently compelling state interest in operating a research-oriented elementary school dedicated to improving the quality of education in urban public schools and concluding that the school's consideration of race/ethnicity in its admission process was narrowly tailored to further that interest), *petition for reh'g in banc filed* (9th Cir. Sept. 22, 1999); *Kromnick v. School Dist. of Philadelphia*, 739 F.2d 894, 906–07 (3d Cir.1984) (upholding a voluntary race-conscious teacher assignment program in light of *de facto* segregation in the school system), *cert. denied*, 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985); *but see Taxman v. Board of Educ. of Piscataway*, 91 F.3d 1547 (3d Cir.1996) (distinguishing *Kromnick* as a "corrective effort[ ] to confront racial segregation or chronic minority underrepresentation in the schools").

More importantly, this Circuit has not previously taken the position that diversity, or other non-remedial state interests, can never be compelling in the educational setting. In fact, binding precedent in this Circuit, *see Parent Ass'n of Andrew Jackson High Sch. v. Ambach*, 598 F.2d 705 (2d Cir.1979) ("*Andrew Jackson I*") and *Parent Ass'n of Andrew Jackson High Sch. v. Ambach*, 738 F.2d 574, 577, 579 (2d Cir. 1984) ("*Andrew Jackson II*"), absent from the District Court's discussion, explicitly establishes that reducing *de facto* segregation, arguably the ultimate goal of the Program as we explain above, serves a compelling government interest. Our review of the proceedings below indicates that the parties neglected to bring this precedent to the attention of the District Court.

These two cases involved a New York City desegregation plan focused primarily on the Andrew Jackson High School in Queens. *See Andrew Jackson I*, 598 F.2d at 710. Queens had experienced a large influx of minority residents after the Second World War and a corresponding departure of many middle-class, mostly white families from the city to the adjacent sub-urbs. *See id.* Andrew Jackson High School became virtually all minority students, with the white students decreasing from over eighty percent in the 1950s to two percent in the late 1970s. *See id.* The high school student population in Queens had become about 48 percent white, and was predicted to decline to about 36 percent white by 1981. *See id.* Various plans had been adopted over time to attempt to address this situation, culminating in a "Controlled Rate of Change Plan," at issue in the *Andrew Jackson* cases. *See Andrew Jackson II*, 738 F.2d at 576. In summary, the plan permitted both white and minority students to transfer out of Andrew Jackson to other schools, but with limitations. Pursuant to the plan, Black and Hispanic students could generally transfer to schools in which white students exceeded fifty percent of the student population, and white students could elect to transfer to schools where the white student population was lower than fifty percent. *See id.* at 576–77. The number of students allowed to transfer in any given year was limited to those who would not decrease the receiving schools' white/minority balance by four percent or more. *See id.* at 577. The plaintiffs who challenged the plan were minority students who could not transfer because of limitations on their choice of schools or by virtue of the required preservation of racial balance. *See id.* The school board's justification for the limitations was that it wanted to avoid "white flight" and consequent resegregation. *See Andrew Jackson I*, 598 F.2d at 719.

In *Andrew Jackson I*, we first affirmed the lower court's finding that the racial segregation at issue in the school "resulted from population changes which state action attempted to impede rather than to assist," i.e., *de facto* segregation. *Id.* at 713. We therefore reversed the district court's ruling that required the city to desegregate Andrew Jackson High School because, as the district judge had ruled, no *de jure* discrimination had caused the segregation

problem, a necessary finding for court-ordered desegregation. *See id.* at 715, 716–17. Given the absence of *de jure* segregation, we noted that "there is no judicially-enforceable constitutional obligation, under existing law, to take affirmative action to remedy racial imbalance," *id.* at 713, but we went on to consider whether the racial quota in the Controlled Rate of Change Plan, undertaken voluntarily by the school district, could survive constitutional scrutiny, *id.* at 717. Applying a strict scrutiny analysis, we held that, as a matter of law, the state has a compelling interest in ensuring that schools are relatively integrated. *See id.* at 717–21 (but remanding as to specific factual issues); *see also Andrew Jackson II*, 738 F.2d at 579 (stating that "[i]n an earlier stage in these proceedings, we held that the Board's goal of ensuring the continuation of relatively integrated schools for the maximum number of students ... survived strict scrutiny as matter of law" and again remanding to determine whether a particular aspect of the plan was necessary).

While the precise issue before us was not addressed explicitly in the *Andrew Jackson* cases, it is clear that in order to conclude that "[i]t is permissible ... for local officials to attempt voluntarily to correct or combat such ... [racial] imbalance at a slower pace than would be satisfactory for a school or district under a court order to dismantle a dual system," *Andrew Jackson I*, 598 F.2d at 713 (citing *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971)), the panels in the *Andrew Jackson* cases necessarily must have considered whether the school district could constitutionally act at all. Indeed, *Andrew Jackson I* held, in the words of *Andrew Jackson II*, that the Plan's aim "to promote a more lasting integration is a sufficiently compelling purpose to justify as a matter of law excluding some minority students from schools of their choice under the obviously race-conscious Rate of Change Plan." *Andrew Jackson II*, 738 F.2d at 577. *See also Clark v. Board of Educ. of*

*Little Rock,* 705 F.2d 265, 271 (8th Cir. 1983) (citation omitted) (relying in part on *Andrew Jackson I* to conclude that "[a]lthough the possibility of white flight and consequent resegregation cannot justify a school board's failure to comply with a court order to end segregation, it may be taken into account in an attempt to promote integration"); *Johnson v. Board of Educ. of Chicago,* 604 F.2d 504, 516–17 (7th Cir.1979) (relying in part on *Andrew Jackson I* for the proposition that "federal courts have held that local school authorities may legitimately take into account the phenomenon of white flight in formulating voluntary programs designed to achieve integration"), *vacated on other grounds,* 449 U.S. 915, 101 S.Ct. 339, 66 L.Ed.2d 162 (1980); *In the Matter of Barnhart,* No. 10,621 21 Educ. Dept. Rep. 126, 128 (Aug. 20, 1981) (decision by the New York State Commissioner of Education relying in part on *Andrew Jackson* for the proposition that "[a]lthough alleged *de facto* segregation does not constitute a sufficient basis for a court to order a racial integration plan, school officials have discretion to adopt voluntary plans to remedy the effects of segregation").

Moreover, there is strong support for *Andrew Jackson I*'s holding in Supreme Court language, which has never been disclaimed by the Supreme Court. In *Swann,* 402 U.S. at 16, 91 S.Ct. 1267, the Court stated in *dicta* that school authorities, who "are traditionally charged with broad power to formulate and implement educational policy[,] ... might well conclude ... that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole." "[A]bsent a finding of a constitutional violation, ... [to order such action] would not be within the authority of a federal court," but "[t]o do this as an educational policy is within the broad discretionary powers of school authorities." *Id.; accord North Carolina Bd. of Educ. v. Swann,* 402 U.S. 43, 45, 91

S.Ct. 1284, 28 L.Ed.2d 586 (1971) ("[A]s a matter of educational policy school authorities may well conclude that some kind of racial balance in the schools is desirable quite apart from any constitutional requirements."); *Washington v. Seattle Sch. Dist. No. 1,* 458 U.S. 457, 460, 473–74, 478–79, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982) (reinstating the authority of the City of Seattle, where "segregated housing patterns ... created racially imbalanced schools," to transport students to help cure the racial imbalance). Thus, these cases establish the principle, under which New York State has functioned for decades, *see, e.g., Balaban v. Rubin,* 20 A.D.2d 438, 446, 248 N.Y.S.2d 574, 581–83 (2d Dep't), *aff'd,* 14 N.Y.2d 193, 199 N.E.2d 375, 250 N.Y.S.2d 281, *cert. denied,* 379 U.S. 881, 85 S.Ct. 148, 13 L.Ed.2d 87 (1964), that local school authorities have the power to voluntarily remedy *de facto* segregation existing in schools and, indeed, such integration serves important societal functions. *See also Willan v. Menomonee Falls Sch. Bd.,* 658 F.Supp. 1416, 1422 (E.D.Wis.1987) ("It is well-settled in federal law that state and local school authorities may voluntarily adopt plans to promote integration even in the absence of a specific finding of past discrimination.").

Only two Supreme Court cases that have been decided since *Andrew Jackson I and II—Wygant* and *Croson*—are even relevant to the continued strength of our precedent. Neither case, however, involved desegregation of a student population in the public school system, a goal that we may assume at this point in the proceedings is more compelling than reduction of racial isolation or underrepresentation in the commercial context—teachers' jobs and the construction industry—at issue in *Wygant* and *Croson*. *See, e.g., Boston's Children First v. City of Boston,* 62 F.Supp.2d 247, 259 (D.Mass.1999) (denying a motion for preliminary relief and noting the significance of racial diversity at the elementary school level in child development). Further, the danger identified by the Supreme Court as inherent in non-

remedial based programs, *see Croson,* 488 U.S. at 498, 109 S.Ct. 706 ("a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy"), is not present when a local school board·acts to remedy clearly identifiable, indeed obvious, racial isolation in particular school districts.

While *Wygant* and *Croson* may raise questions as to the vitality of *Andrew Jackson I & II*'s holdings, we cannot conclude that the law has been sufficiently altered since their issuance to render them effectively overruled. Even *Bakke,* which was decided prior to the *Andrew Jackson* cases, is not directly on point as it expressed no opinion as to the compelling interest of reducing racial isolation in elementary public school education. Moreover, the plaintiff in *Bakke* was completely denied his education, unlike Haak who was only prevented from attending the school of her choice. *See Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 300 n. 39, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (noting fact that· the defendant "did not arrange for [Bakke] to attend a different medical school" which made Bakke's situation "wholly dissimilar" to that of an elementary or secondary school student who is admitted to one school rather than another in an effort to promote racial or ethnic integration).

Finally, the District Court's reliance on *Wessmann v. Gittens,* 160 F.3d 790, 795 (1st Cir.1998), to support a contrary conclusion, is unconvincing. *See Brewer,* 32 F.Supp.2d at 629. In rejecting the Boston Latin School's argument that it was attempting to alleviate vestiges of past discrimination, *Wessmann* relies, we think wrongly, on Supreme Court precedent which holds merely that absent a finding of a constitutional violation, a school district is under no obligation, enforceable by a federal court, to remedy the imbalance. *See Wessmann,* 160 F.3d at 801 (citing

*Swann,* 402 U.S. at 32, 91 S.Ct. 1267 and *Freeman v. Pitts,* 503 U.S. 467, 494, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992)). The absence of a duty sheds little light on the constitutionality of a voluntary attempt. Further, *Wessmann* is more akin to *Bakke* because the plaintiff was not offered an equivalent alternative education, as here. Most significantly, the First Circuit, unlike ours, has never to our knowledge previously held, as we did in *Andrew Jackson I and II,* that combating *de facto* segregation is a compelling government interest.

In short, we do not think that we can conclude "clearly"—the plaintiffs' burden in this case—that reduction of racial isolation to ameliorate what may be *de facto* segregation in the voluntarily participating public schools is not a compelling state interest given: (1) the binding authority of the *Andrew Jackson* cases, which appear directly applicable to the issue before us and have not been overruled by any subsequent Supreme Court case law; (2) the absence of a Supreme Court decision dealing with permissible race-based justifications in the educational context; and (3) the lack of a clear majority from the Supreme Court regarding permissible justifications for race-based classifications generally. *Cf. Walmer v. United States Dep't of Defense,* 52 F.3d 851, 854–55 (10th Cir.) (affirming a district court's denial of a preliminary injunction application where the plaintiff failed to show "questions going to the merits so serious, substantial, difficult and doubtful" because the plaintiff failed to show how a governmental interest, previously defined as "compelling" by the court, was distinguishable from the case before it), *cert. denied,* 516 U.S. 974, 116 S.Ct. 474, 133 L.Ed.2d 403 (1995).

There may be relevant, even dispositive, factual distinctions between the *Andrew Jackson* cases and the case before us. In this respect, the question of whether the precise goals of the Program fit within the *Andrew Jackson* analysis requires a fact-specific determination that we believe should be made by the District Court in the first instance. Because the District Court did not, to our knowledge, consider the *Andrew Jackson* cases, we do not have the benefit of its determination in this regard. At this point, therefore, we conclude that we are bound by this Court's determination in *Andrew Jackson I and II* that a compelling interest *can* be found in a program that has as its object the reduction of racial isolation and what appears to be *de facto* segregation.

## B. *Narrow Tailoring Analysis*

The District Court stated that "[p]erhaps the most constitutionally infirm aspect of the Program ... is that it is not narrowly tailored to further the alleged interests at stake." *Brewer,* 32 F.Supp.2d at 633. Given the procedural posture of the case, where plaintiffs are subjected to a heightened standard, we cannot conclude that the Program is not narrowly tailored on the basis of the record thus far.

We recognize that the District Court did conduct a narrow tailoring analysis. We believe, however, that it focused on the wrong question: the District Court asked whether the Program is narrowly tailored to achieve the goal of "true diversity," *see, e.g., id.* at 634, when the appropriate inquiry, as evident from our discussion in the preceding sections, is whether the Program is narrowly tailored to achieve its primary goal of reducing racial isolation resulting from *de facto* segregation. The difference in these two frameworks is not mere semantics. If reducing racial isolation is—standing alone—a constitutionally permissible goal, as we have held it is under the *Andrew Jackson* cases, then there is no more effective means of achieving that goal than to base decisions on race. "True diversity," on the other hand, may certainly be defined more broadly than race. *See Bakke,* 438 U.S. at 315, 98 S.Ct. 2733. Indeed, the cases cited by the District Court in support of its decision that the use of race alone in the Program was not narrowly tailored, *see Brewer,* 32 F.Supp.2d at 633 (citing *Wess-*

*mann, Bakke,* and *Hopwood* ), only address the efficacy of employing strictly racial classifications to achieve "true diversity." Those decisions are, therefore, inapplicable to the present situation where the Program's aim, as initially found by the District Court and affirmed by this Court today, is precisely to ameliorate *racial* isolation in the participating districts.

 Though the District Court did at one point in its narrow tailoring analysis state that "the Program seeks to attain a vaguely-defined goal—'avoiding racial isolation,'" *Brewer,* 32 F.Supp.2d at 634—it quickly pointed out its view that this goal's "status as a compelling government interest is highly suspect." *Id.* The District Court did not have the benefit of our conclusion today that, under the *Andrew Jackson* cases, reduction of racial isolation resulting from *de facto* segregation can be a compelling government interest justifying racial classifications. That conclusion, after consideration by the District Court, may affect the outcome of the compelling interest inquiry in this case, which, in turn, alters the framework of the narrow tailoring issue. In short, we do not feel we have had the full benefit of the District Court's narrow tailoring analysis because the court primarily conducted its analysis with the goal of "true diversity" in mind. Thus, given the plaintiffs' substantial burden in seeking the mandatory injunction, and the extremely fact-specific analysis required for the narrow tailoring inquiry, we think it appropriate to allow the District Court in the first instance to again explore the Program's administration on a more fully developed factual record, *cf. Beal v. Stern,* 184 F.3d 117, 128–30 (2d Cir.1999) (holding that the appellants had not shown a "clear" likelihood of success in part because there was insufficient evidence to determine whether the regulation at issue was narrowly tailored), focusing on the Program's primary goal of reducing racial isolation, if the District Court concludes that that goal is indeed a compelling one in this case.

## CONCLUSION

For the foregoing reasons, we vacate the preliminary injunction of the District Court ordering that Haak be allowed to transfer to the Irondequoit District pursuant to the Program, and remand the case for trial consistent with this opinion. However, assuming that Haak has begun attending Irondequoit for the 1999–2000 school year, we order that she be allowed to finish the school year there. All possible efforts should be made to resolve this matter before the beginning of the 2000–2001 school year.

PARKER, Circuit Judge, concurring:

I concur in the majority opinion because I agree that the preliminary injunction should be vacated. I also have no disagreement with the opinion's view that this Circuit's jurisprudence, as enunciated in the two Andrew Jackson High School cases, permits a school board to employ racial classifications in programs designed to remedy *de facto* segregation. *See Parent Ass'n of Andrew Jackson High Sch. v. Ambach,* 598 F.2d 705 (2d Cir.1979); *Parent Ass'n of Andrew Jackson High Sch. v. Ambach,* 738 F.2d 574 (2d Cir.1984). At least at the inception of the program at issue in this case, the defendants may well have had a compelling interest to act to reduce racial isolation. I write specifically, however, to express my serious reservations about any potential remedy which might be available upon remand.

It is important to note that this program has been in existence for 35 years. The program's goal, as acknowledged in the majority opinion, is reduction of racial isolation. Racial isolation exists when "a school or school district enrollment consists of a predominant number or percentage of students of a particular racial/ethnic group." N.Y. Comp.Codes R. & Regs. tit. 8, § 175.24(a)(2) (1999). The statistics with which we have been supplied during this appeal suggest that in the 35 years of its existence the minority pupil population

in Rochester City School District ("RCSD") has increased from 25.6 percent to 80 percent. We have no historical data for the participating suburban Monroe County districts. However, as of the 1996–1997 school year, the percentage of white students in the participating suburban districts ranged from approximately 85 percent to 92 percent. The number of minority students who participated in the program in the 1998–1999 school year was approximately 580. The RCSD pupil enrollment is presently close to 36,000 students. If those statistics are accurate, it is extremely difficult to see how this program has had any meaningful impact upon the existence of schools or school districts with "a predominant number or percentage of students of a particular racial/ethnic group."

Therefore, even though the defendants may have had a sufficiently compelling interest to justify the program at its inception, it is difficult to see how the interest continues, given the program's limited impact. If a compelling interest no longer exists, it seems to me that the entire program may fail as being unconstitutional, and the plaintiffs would have no remedy. This aspect of the appeal is one which apparently was not explored by the court below because the plaintiffs made no facial challenge to the program as a whole. Given the very limited development of this issue in the record before us, I believe that a remand for further consideration is the appropriate disposition. I accordingly join with the majority opinion's disposition.

MINER, Circuit Judge, dissenting:

Today the Court leaves in place the Monroe County Urban–Suburban Interdistrict Transfer Program ("the Program"). Designed to "reduce racial isolation" and achieve other goals as well, there is absolutely no evidence that the Program has succeeded in accomplishing its purposes after a full thirty-five years of existence. Aside from being a total failure (as so clearly demonstrated in the concurring opinion) and more to the point here, the Program has been administered, at least in the case of Jessica Haak, strictly on the basis of racial classification.

The Supreme Court teaches that race-conscious remedies are subject to strict scrutiny, which requires among other things that they be narrowly tailored to achieve a compelling government interest. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). Otherwise, the racial classification is violative of the Equal Protection Clause of the Fourteenth Amendment ("No State shall ... deny to any person within its jurisdiction the equal protection of the laws.") and, as well, § 3201 subd. 1 of the New York Education Law ("No person shall be refused admission into or be excluded from any public school in the state of New York on account of race, creed, color or national origin."). The Program challenged here was not "narrowly tailored" as applied to Jessica Haak. In point of fact, it was not "tailored" at all. Because Jessica's transfer to the West Irondequoit Central School District from the Rochester City School District was revoked solely because of her race and purportedly in accordance with the Program, her constitutional rights clearly were violated.

The Program has its basis in subdivision 36.a. of section 3602 of the New York Education Law, which provides as follows:

A school district which accepts pupils from another school district in accordance with a voluntary interdistrict urban-suburban transfer program designed to reduce racial isolation which is approved by the commissioner in accordance with regulations adopted by him for such purpose shall be eligible for aid pursuant to this subdivision.

N.Y. Educ. Law § 3602 36.a. (McKinney 1995). Pursuant to this statute, the New York Commissioner of Education has adopted regulations governing the provision of state aid for urban-suburban transfer programs. The regulations define ra-

cial isolation to "mean[ ] that a school or school district enrollment consists of a predominant number or percentage of students of a particular racial/ethnic group." 8 N.Y. Comp.Codes R. & Regs. tit. 8, § 175.24(a)(2) (1999). The regulations define a minority pupil as "a pupil who is of Black or Hispanic origin or is a member of another racial minority group that historically has been the subject of discrimination." *Id.* § 175.24(a)(1).

According to the regulations, an urban school district and a suburban school district desiring to participate must submit a joint application including "racial/ethnic enrollment data." *Id.* § 175.24(b)(2). To be approved for state aid, the districts must demonstrate that their "program will reduce racial isolation by transferring minority pupils, nonminority pupils or both on a voluntary basis between participating urban and suburban districts." *Id.* § 175.24(c)(1). The regulations specify that pupils are not to be transferred solely to improve upon the receiving district's nonacademic pursuits such as athletics. *See id.* § 175.24(c)(3)(i). Nor are transfer pupils to be selected solely because of handicapping conditions, irregular attendance, low academic performance or disciplinary problems. *See id.* § 175.24(c)(3)(ii). Annual reports to the Commissioner regarding the operation of the programs are required. *See id.* § 175.24(d).

Although the statute and the regulations governing interdistrict transfer programs speak only of a purpose to reduce racial isolation, the Mission Statement adopted for the Monroe County Program lists the following goals: "Reducing Minority Group Isolation; Encouraging Intercultural Learning; Promoting Academic Excellence; Fostering Responsible Civic Leadership." Presumably in furtherance of these goals, and pursuant to the Program, Jessica was accepted as a transfer student in the West Irondequoit Central School District (a suburban district program participant) from the Rochester City School

District (an urban district program participant). In a joint application to the Commissioner of Education, the participants in the Monroe County Program described the Program as. "a voluntary plan which is designed to bring together students from the various social, economic, ethnic, cultural, and racial backgrounds."

Jessica's application to participate in the Program was acknowledged in a letter to Jessica's mother from the Program Director dated August 20, 1996. The letter included the following paragraph:

The six participating suburban districts are continuing to accept a few students at various grade levels each year, dependent on available space. Acceptance of students is also based on the indication in the student's current school records that he/she is performing at an average level, based on test scores, teachers' comments, regular attendance with minimal tardiness.

Thereafter, by letter dated September 26, 1997, the Program Director advised Jessica's mother that Jessica could not be placed that year because "we have too many applicants for too few spaces in the receiving suburban school districts." The following year, by letter to Jessica's mother dated July 8, 1998, the "possibility of placement" for that year was noted. What happened thereafter is crystal clear: Jessica was accepted into the Program, the acceptance was noted in writing even after she was seen by an Assistant Principal in the Irondequoit School District, and then, in the words of my colleagues "her acceptance was revoked after another administrator became concerned that [Jessica] was not a minority pupil when she saw [Jessica] in person and verified her race as Caucasian/White in the Rochester District records." *See supra* at [page 743].

Any analysis of the validity of the Program must begin with a proposition that is by now basic in American Jurisprudence: "[R]acial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon extraordinary

justification." *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). Such justification is hard to come by, because "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand,* 515 U.S. at 227, 115 S.Ct. 2097. To pass strict scrutiny, the Program here must consist of "narrowly tailored measures that further compelling governmental interests." *Id.* The Program does not pass constitutional muster as applied to Jessica Haak.

If we were writing on a clean slate, I would endorse the viewpoint that remedying past discrimination is the only compelling interest that justifies considerations of race *alone. Cf. Hopwood v. Texas,* 78 F.3d 932, 944–45 (5th Cir.1996), *reh'g en banc denied* 84 F.3d 720 (1996) (not permitting the use of race, even as one of many factors, without a showing of past discrimination). I recognize that there is authority going the other way and that the Seventh Circuit properly has observed that the question is "unsettled." *See McNamara v. City of Chicago,* 138 F.3d 1219, 1222 (7th Cir.1998). Although I favor the widely-cited concurring opinion of Justice Powell in *Regents of University of California v. Bakke,* 438 U.S. 265, 313, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), which identifies race to be one of several factors in achieving a diverse student body as a compelling state interest, the Supreme Court never has adopted that position. As my colleagues note, however, we already have found a compelling interest in a program with purposes sufficiently similar to the one under examination here to settle the question in this Circuit. *See Parent Ass'n of Andrew Jackson High Sch. v. Ambach,* 738 F.2d 574, 577 (2d Cir.1984); 598 F.2d 705 (2d Cir.1979).

In the *Andrew Jackson* cases, we considered a program in which minority students in the mostly minority Andrew Jackson High School in the borough of Queens were allowed to attend more racially balanced schools elsewhere in New York City. The challenge to the program came not from white students excluded from participation in the program, but rather from minority students who were denied their ability to transfer. The transfer system allowed Black and Hispanic students residing within the Jackson school zone, subject to certain restrictions, to attend any New York City high school not already overenrolled. The restrictions included elaborate computations designed to accomplish the program's purpose. The limitation of transfers was based on a theory that if too many minority students transferred to integrated schools, then the already occurring white flight would accelerate. *See* 738 F.2d at 576–77.

The program allowed white students in the Jackson zone to attend any high school in which the percentage of white students was lower than the receiving Borough's white percentage or fifty percent of the school population, whichever was less. We determined that the program should be evaluated under the strict scrutiny standard because it was race-based. We concluded that the "Plan's aim to promote a more lasting integration is a sufficiently compelling purpose to justify as a matter of law excluding some minority students from schools of their choice under the obviously race-conscious [School District] Rate of Change Plan." 738 F.2d at 577 (quoting 598 F.2d at 719) (internal quotation omitted). In this Circuit, therefore, whether the interest is in developing a more lasting integration in the face of *de facto* segregation, in promoting racial diversity, or in reducing racial isolation, each must be considered similarly as a compelling state interest because all are similar.

I turn now to the second prong of the strict scrutiny analysis—narrow tailoring. The Supreme Court has enumerated the factors to be considered in assessing the appropriateness of race-conscious remedies: "the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including

the availability of waiver provisions; the relationship of the numerical goals to the relevant [student population]; and the impact of the relief on the rights of third parties." *United States v. Paradise*, 480 U.S. 149, 171, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (plurality).

There was absolutely no effort of any kind to assess any of these factors in establishing the Program. Race alone was the standard for determining Jessica's eligibility for transfer. This despite the fact that the Program's goals included the encouragement of intercultural learning, the promotion of academic excellence and the development of responsible civic leadership. There is no showing that any of these other factors was considered in connection with Jessica's application for transfer. How can it be said that the Program was narrowly tailored? Jessica was told, in effect: "The purpose of the Program is only to reduce racial isolation, and you are disqualified only by reason of race." Perhaps the other goals of the Program were taken into account in assessing the eligibility of other students for transfer, but they certainly were not applied in Jessica's case.

I agree with my colleagues that the learned district judge erred by conducting the narrow tailoring analysis with the thought in mind that the goal of the Program was to achieve "true diversity." While the goal of the Program never was "true diversity," goals other than the reduction of racial isolation also were stated (but not applied in Jessica's case). However, even if I were to take my colleagues' point that the *primary* goal of the Program was a reduction of racial isolation, I would still conclude that the Program was not narrowly tailored to achieve that goal.

Applying just some of the *Paradise* factors shows that those responsible for the Program have made no attempt to tailor the Program in any way. For example, no consideration was given to the length of time the Program has been in existence— thirty-five years—without any apparent success in reducing racial isolation. This is an especially long "try-out," and even programs designed to deal with *de facto* segregation must end sometime. There is no showing that any alternate remedies, such as magnet schools, vouchers, open enrollment, or redrawing boundaries, have been explored. The relationship of numerical goals to the total student population has not been examined. The impact of the race-based choices on the rights of third parties is an important *Paradise* factor that has received no consideration. As to the flexibility of relief factor, it seems to me that those responsible for the Program have applied the most inflexible approach possible.

The majority opinion refers to "the extremely fact-specific analysis required for the narrow tailoring inquiry" in remanding for the "District Court in the first instance to again explore the Program's administration on a more fully developed factual record." *See supra* at [page 753]. In support of the remand, the majority cites *Beal v. Stern*, 184 F.3d 117, 128–29 (2d Cir. 1999). *Beal* was an action challenging a city ordinance requiring a permit for conducting rallies on city park property as an impermissible speech restraint. In affirming the denial of a preliminary injunction, we stated: "As to narrow tailoring, we simply do not have sufficient evidence to determine whether the means chosen by the Parks Department are substantially broader than necessary. Resolution of this issue will depend on amplification of the record as to various matters...." *Id.* at 130.

The *Beal* case is inapposite. We are not confronted here with a need to "amplify the record" to resolve the narrow tailoring issue. The record is complete in our case. Why for the purpose of the matter before us is it then necessary for the district court to explore once again the administration of the Program? We know that Jessica Haak was excluded from the Program strictly on the basis of her race, and those who administer the Program do not deny

this. They say (incorrectly as it appears) that their only goal is to reduce racial isolation and that the only way to do that is to prohibit her transfer under the Program.

When it is as apparent as it is here that the narrow tailoring requirement of the strict scrutiny test is unfulfilled, a preliminary injunction must issue, and I would affirm the entry of such an order in this case. *See Eisenberg v. Montgomery County Pub. Schs.*, 197 F.3d 123 (4th Cir. 1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 1420, 146 L.Ed.2d 312 (2000). *Eisenberg* involved an appeal from a denial of a preliminary injunction that sought to compel a student's transfer to a magnet program. The school district denied the transfer because the student did not meet "the diversity profile." Passing on the question of compelling governmental interest, the Fourth Circuit determined that the transfer was improperly denied because it was based solely on race. The court also found that racial balancing is not a narrowly tailored remedy, and that the student was entitled to a preliminary injunction admitting him to the magnet program and a final injunction requiring the school authorities to consider his application without consideration of race. *See id.* at 133–34. *Cf. Tuttle v. Arlington County Sch. Bd.*, 195 F.3d 698, 706–08 (4th Cir.1999) (applying *Paradise* factors and finding narrow tailoring lacking in admissions policy designed to promote racial, ethnic and socioeconomic diversity, but vacating permanent injunction to allow school district to present alternate admissions policy).

Finally, I take issue with the following statement relating to the narrow tailoring analysis in the majority opinion: "If reducing racial isolation is—standing alone—a constitutionally permissible goal, as we have held it is under the *Andrew Jackson* cases, then there is no more effective means of achieving that goal than to base decisions on race." *See supra* at [page 752]. I address this statement as a means

of recapitulating the bases for my dissent. First, I do not agree that reducing racial isolation is by itself a constitutionally permissible goal in the absence of a showing of past discrimination, but I am constrained to accept that it is by virtue of our precedent. Second, I do not agree with my colleagues that reducing racial isolation is the "primary" goal of the Program under analysis; it is one of four equally stated goals, but it is the *only* one that has been applied in the case of Jessica Haak. Third, I do agree that there is no more effective means of achieving the reduction of racial isolation than to base decisions on race alone. It *is* the most effective means; in this case, it just is not a constitutional means.