Earl WITTMER, Earl Craig Cox, and James Jeffers, Plaintiffs–Appellants,

v.

Howard A. PETERS, III, et al., Defendants–Appellees.

Nos. 95–3729, 95–4034.

United States Court of Appeals, Seventh Circuit.

Argued May 14, 1996.

Decided July 2, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 27, 1996.

Mary L. Leahy (argued), Cheryl R. Jansen, Springfield, IL, for Plaintiffs-Appellants.

Jeffrey D. Colman, Edward J. Lewis, II (argued), Melissa S. Widen, Jenner & Block, Chicago, IL, for Defendants-Appellees.

Before POSNER, Chief Judge, and ESCHBACH and EVANS, Circuit Judges.

POSNER, Chief Judge.

A number of states, including Illinois, have been experimenting in recent years with "boot camps" (or "shock incarceration," as it is sometimes called) for young criminals, in lieu of conventional prisons. See 730 ILCS 5/5–8–1.1 ("impact incarceration"); *Correctional Boot Camps: A Tough Intermediate Sanction* (Doris L. MacKenzie & Eugene E. Hebert eds., U.S. Dept. of Justice, Feb. 1996); Steven P. Karr & Robert J. Jones, "The Development and Implementation of Illinois' Impact Incarceration Program," in *id.* at 69. The idea is to give the inmates an experience similar to that of old-fashioned military basic training, in which harsh regimentation, including drill-sergeant abuse by correctional officers, is used to break down and remold the character of the trainee. This appeal raises the question whether the warden of a boot camp can ever take race into account in staffing it.

Illinois opened a boot camp in Greene County in 1993. It is a minimum security facility for nonviolent male criminals who are between 17 and 35 years of age, have no more than one previous felony, and are serving a prison sentence of no more than 8 years. If they complete a 120 to 180–day stint in the camp their sentence is reduced to time served. The camp holds 200 inmates, of whom, at the end of 1993, 68 percent were black. The security staff consists of 48 correctional officers, of whom only 2 were black when the camp opened and during the period relevant to this suit, plus 3 captains all of whom were white and 10 lieutenants of whom 2 (a man and a woman) were black. We do not know the current racial composition of the staff.

The plaintiffs are three white correctional officers who applied unsuccessfully for lieutenants' positions. They claim that the black man who was made a lieutenant was less qualified than they and received the appointment only because of his race. He ranked forty-second in the test given to applicants while the plaintiffs ranked third, sixth, and eighth. The defendants, officials of the Illinois Department of Corrections, do not deny that race was a factor in the appointment of the black but they submitted, in opposition to the plaintiffs' motion for summary judgment, reports by expert witnesses attesting to the penological necessity for the appointment. The judge thought little of these reports, though not because they were unsworn, hence not affidavits, hence not, strictly speaking, admissible to support or oppose summary judgment. Fed.R.Civ.P. 56(e); *Fowle v. C & C Cola,* 868 F.2d 59, 67 (3d Cir.1989). Both sides presented their expert evidence in this form, and, unlike the situation in *Fowle,* neither side objected. Rather, the judge held that the reports did not satis-

fy the defendants' stringent burden of justifying racial discrimination, and he therefore granted summary judgment for the plaintiffs on liability. But he rejected the plaintiffs' claim for damages, on the ground that the defendants had qualified immunity; and he denied the plaintiffs' request for injunctive relief on the ground that they had not established a causal relation between the appointment of the black and the rejection of their own applications. So he granted no relief to the plaintiffs, and he also refused to award attorneys' fees to them. Their victory on the constitutional issue turned out to be entirely Pyrrhic, and they appeal.

■ The defendants defend the grounds on which the district judge rejected the relief sought by the plaintiffs, but they also argue that the selection of a black applicant for the lieutenant's position did not, in the circumstances of the case, violate the Constitution. We think this is right, and so need not discuss any other issue. For future reference, however, we point out that the proper form of injunctive relief in this case is not, as the plaintiffs argue, to order the persons discriminated against appointed to the positions that they had applied for, unless they prove they would have been appointed had it not been for the discrimination. With the three plaintiffs all competing for a single position, an order that they all be appointed to it would be absurd. What they lost was merely a chance, and the proper injunctive remedy (the proper damages remedy we discussed in *Doll v. Brown*, 75 F.3d 1200, 1205–07 (7th Cir.1996)) is to restore the chance by enjoining the discriminatory practice. Whether to go further by booting out the incumbent and letting the plaintiffs compete for his job, rather than just for future openings, would be a matter within the equitable discretion of the district judge. *Id.* at 1205. But all this is on the assumption that the plaintiffs' rights were violated. They were not.

The plaintiffs remind us that discrimination in favor of blacks and members of other minority groups, like discrimination against them, is subject to the test of strict scrutiny. *Adarand Constructors, Inc. v. Pena*, — U.S. —, —––—, 115 S.Ct. 2097, 2110–

13, 132 L.Ed.2d 158 (1995) (plurality opinion). It used to be thought that "subject to strict scrutiny" was a euphemism for "absolutely forbidden" ("strict in theory, fatal in fact," was the refrain). Some Justices expressly reject this equation. *Id.* at —, 115 S.Ct. at 2117 (plurality opinion). Whether they are a majority of the Court is unclear, see *id.* at —, 115 S.Ct. at 2101 (plurality opinion); *id.* at —, 115 S.Ct. at 2118 (separate opinion), but enough other Justices reject subjecting reverse discrimination—discrimination in favor of a minority—to strict scrutiny to create a majority of the Court in favor of permitting some reverse discrimination. *Id.* at —, 115 S.Ct. at 2117 (plurality opinion); *id.* at —–—, 115 S.Ct. at 2122–23 (dissenting opinion). And a recent dictum associates a majority of the Court with rejection of the proposition that strict scrutiny of racial classifications is inevitably "fatal in fact." *United States v. Virginia*, — U.S. —, — n.7, 116 S.Ct. 2264, 2276 n. 7, 135 L.Ed.2d 735 (1996). How *much* reverse discrimination is permitted is unclear. All that is clear is that discrimination in favor of a minority is sometimes permissible to rectify past discrimination against that minority by the discriminating institution. But this shows that reverse discrimination is not illegal per se, although it does not establish that there are any other exceptions besides the one for correcting past discrimination. That question remains open in the Supreme Court. The plaintiffs, as we are about to see, want us to answer it "no."

■ While we may assume that a practice that is subject to the skeptical, questioning, beady-eyed scrutiny that the law requires when public officials use race to allocate burdens or benefits is not illegal per se, it can survive that intense scrutiny only if the defendants show that they are motivated by a truly powerful and worthy concern and that the racial measure that they have adopted is a plainly apt response to that concern. They must show that they had to do something and had no alternative to what they did. The concern and the response, moreover, must be substantiated and not merely asserted. *Wygant v. Jack-*

son *Board of Education,* 476 U.S. 267, 276–78, 106 S.Ct. 1842, 1848–49, 90 L.Ed.2d 260 (1986) (plurality opinion); *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 494–95, 109 S.Ct. 706, 722–23, 102 L.Ed.2d 854 (1989) (plurality opinion); *Hayes v. North State Law Enforcement Officers Ass'n,* 10 F.3d 207, 213–17 (4th Cir.1993). It is not enough to say that *of course* there should be some correspondence between the racial composition of a prison's population and the racial composition of the staff; common sense is not enough; common sense undergirded the pernicious discrimination against blacks now universally regretted.

The plaintiffs argue that the *only* form of racial discrimination that can survive strict scrutiny is discrimination designed to cure the ill effects of past discrimination by the public institution that is asking to be allowed to try this dangerous cure. There are dicta to this effect. *City of Richmond v. J.A. Croson Co., supra,* 488 U.S. at 493, 109 S.Ct. at 721 (plurality opinion); *Hopwood v. Texas,* 78 F.3d 932, 944 (5th Cir.1996); *Milwaukee County Pavers Ass'n v. Fiedler,* 922 F.2d 419, 421–22 (7th Cir.1991). And certainly it is the most frequently mentioned example of a case in which discrimination is permissible. *Billish v. City of Chicago,* 989 F.2d 890, 893 (7th Cir.1993) (en banc); *Triad Associates, Inc. v. Robinson,* 10 F.3d 492, 500 n. 10 (7th Cir.1993). But there is a reason that dicta are dicta and not holdings, that is, are not authoritative. A judge would be unreasonable to conclude that no other consideration except a history of discrimination could ever warrant a discriminatory measure unless every other consideration had been presented to and rejected by him. The dicta on which the plaintiffs rely were uttered in cases that did not involve, by judges who had never had cases that involved, the racial composition of a prison's staff. Such cases were not, at least insofar as one can glean from the opinions, present to the minds of the judges when they considered and rejected other grounds for discrimination and expressed that rejection in the sweeping dicta that we have mentioned. The weight of judicial language depends on context, by these plaintiffs ignored. Other cases, moreover, single out the law-enforcement and correctional settings as the very *clearest* examples of cases in which departures from racial neutrality are permissible. *Barhold v. Rodriguez,* 863 F.2d 233, 238 (2d Cir.1988); *Talbert v. City of Richmond,* 648 F.2d 925, 931–32 (4th Cir.1981); *Detroit Police Officers' Ass'n v. Young,* 608 F.2d 671, 695–96 (6th Cir.1979); *Minnick v. California Dept. of Corrections,* 95 Cal.App.3d 506, 157 Cal.Rptr. 260, 268–69 (1979). At argument the plaintiffs' counsel conceded, in response to a question from the bench, that separation of the races in a prison that was undergoing a race riot would not violate the Constitution. That is a clearer case for discrimination than this, but our point is only that the rectification of past discrimination is not the only setting in which government officials can lawfully take race into account in making decisions.

It is not as if the rectification of past discrimination had a logical or equitable priority over other legitimate goals that discrimination might serve. If the plaintiff himself was a victim of discrimination by the defendant and merely seeks a decree that would put him where he would have been but for that discrimination, he is not seeking preferential treatment at all; he is asking merely to be put where he would be in a world that had no discrimination, whether in favor of or against the members of his group. Cf. *Doll v. Brown, supra,* 75 F.3d at 1205. But in the usual case in which a remedy giving preference to a racial or other historically disfavored group is defended as necessary to rectify past discrimination, the plaintiffs, the people who will benefit from the remedy, are not the people who were discriminated against, but their successors or descendants. For them the relief is a windfall, and its justification must be sought elsewhere than in notions of compensation that might seem to make a stronger case for a discriminatory remedy than an interest in racial peace or effective prison administration would make. *Adarand Constructors, Inc. v. Pena, supra,* —— U.S. at ——–——, 115 S.Ct. at 2118–19 (separate opinion).

We are mindful that the Supreme Court has rejected the "role model" argument for reverse discrimination. See *City of Richmond v. J.A. Croson Co., supra,* 488 U.S. at

497–98, 109 S.Ct. at 723–24 (plurality opinion); *Wygant v. Jackson Board of Education, supra,* 476 U.S. at 274–76, 106 S.Ct. at 1847–49 (plurality opinion). There are many weak arguments for discrimination, and the "role model" theory, at least to the extent that it has been developed in the cases to date, is one, because of lack of substantiation and a well-nigh unlimited reach. The argument for the black lieutenant is not of that character. We doubt that many inmates of boot camps aspire to become correctional officers, though doubtless some do. See American Correctional Association, *Standards for Adult Correctional Boot Camp Programs* 14 (1995). In any event that is not the justification advanced. The black lieutenant is needed because the black inmates are believed unlikely to play the correctional game of brutal drill sergeant and brutalized recruit unless there are some blacks in authority in the camp. This is not just speculation, but is backed up by expert evidence that the plaintiffs did not rebut. The defendants' experts—recognized experts in the field of prison administration—did not rely on generalities about racial balance or diversity; did not, for that matter, defend a goal of racial balance. They opined that the boot camp in Greene County would not succeed in its mission of pacification and reformation with as white a staff as it would have had if a black male had not been appointed to one of the lieutenant slots. For then a security staff less than 6 percent black (4 out of 71), with no male black supervisor, would be administering a program for a prison population almost 70 percent black in a prison the staff of which is expected to treat the inmates with the same considerateness, or rather lack of considerateness, that a marine sergeant treats recruits at Parris Island.

It is true, as the district court pointed out, that the defendants' expert witnesses had had little experience with boot camps and that the social scientific literature on which they relied does not focus on such institutions. The reason is that these institutions are too recent to have been studied exhaustively, given the leisurely pace at which most academic research proceeds. If academic research is required to validate any departure from strict racial neutrality, social experimentation in the area of race will be impossible despite its urgency. Roughly half the prison population of the United States is black. On the conception of strict scrutiny advanced by the plaintiffs, the first boot camp that tried to alter the racial composition of its staff would be enjoined. It would be impossible to accrue experience on the issue and the whole boot camp experiment might fail if, as the defendants' experts believe, its success requires some departure from racial neutrality.

The plaintiffs presented reports by two experts of their own, but these reports do not join issue with the defendants' experts. All that the reports say, which no one denies, is that belonging to the same race as the inmates is not a requirement of effectiveness as a guard. They cast no doubt on the proposition that in the particular circumstances that confronted the Greene County boot camp when it was created three years ago the appointment of a black male lieutenant was essential. The reports are, at most, naked conclusions, and as such do not create a genuine issue of material fact. *Mid–State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1338–39 (7th Cir.1989); *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 92 (1st Cir.1993).

The defendants do not argue, and we do not hold, that they would have been entitled to take steps to make the racial composition of the security staff mirror that of the inmate population. That would have gone beyond the limits of demonstrable need. Nor do we hold or believe that prison authorities are entitled to yield to extortionate demands from prisoners for guards of their own race. Cf. *Cooper v. Aaron,* 358 U.S. 1, 16, 78 S.Ct. 1401, 1408, 3 L.Ed.2d 5, 19 (1958). There is no suggestion of that here. We also do not hold that race is (or is not) a proper factor to take into account in staffing an ordinary prison, in which the guards do not interact with the inmates in the same fierce intimacy as in a boot camp. That issue is not before us either. We do not hold that after correctional boot camps have been around long enough to enable thorough academic (or academic-quality) study of the racial problems involved in their administration, prison officials can

continue to coast on expert evidence that extrapolates to boot camps from the experts' research on conventional prisons. Maybe such studies exist, for there have been correctional boot camps since 1983. *Correctional Boot Camps: A Tough Intermediate Sanction, supra,* at vii. But the plaintiffs do not claim that there are any such studies, and our own research has not turned up any. We hold only that on the record compiled in the district court, the preference that the administration of the Greene County boot camp gave a black male applicant for a lieutenant's job on the ground of his race was not unconstitutional.

One final caveat. We do not understand the plaintiffs to be arguing that even if the district court erred (as we have found) in giving no weight to the reports of the defendants' experts, and the judgment of liability must therefore be reversed, the next step (were the plaintiffs to prevail on the other grounds of appeal that they have presented) should be a trial on that issue. That would be the usual sequel to reversing a grant of summary judgment. But the plaintiffs seem content to lose on the issue of liability if we reject their objections to those reports and their legal submission that only a history of discrimination by the defendants could justify preferential treatment of an applicant for employment on grounds of race. They do not want a trial. If as we believe the only question preserved for our decision, so far as liability is concerned, is which side was entitled to summary judgment, the answer is the defendants.

AFFIRMED.