**Samantha J. COMFORT, on Behalf of her minor child and friend, Elizabeth NEUMYER, et al., Plaintiffs,**

v.

**LYNN SCHOOL COMMITTEE, et al., Defendants,**

and,

**Commonwealth of Massachusetts, Defendant–Intervenor.**

No. C.A.99–11811–NG.

United States District Court, D. Massachusetts.

May 31, 2000.

---

**4.** Dr. Courville is not a defendant here, and there is no claim by the plaintiff that the

surgery was negligently performed.

Chester Darling, Boston, MA, for Plaintiffs.

John C. Mihos, Lynn, MA, for the Lynn School Committee and its members, Defendants.

James Lamanna, Lynn, MA, for the City of Lynn, Defendants.

John R. Hitt, Richard Cole, Judith Yogman, Jacinta Ma, Assistant Attorneys General, Boston, MA, for the Commonwealth of Massachusetts, Defendant.

Bill Lann Lee, Jeremiah Glassman, Ross Wiener, Assistant Attorneys General,

Washington, DC, submitted Brief of the United States as Amicus Curiae.

*AMENDED MEMORANDUM AND ORDER*

GERTNER, District Judge.

### TABLE OF CONTENTS

I. *STANDARD FOR GRANTING A PRELIMINARY INJUNCTION* .............. 60
II. *FACTUAL BACKGROUND* ........................................... 61
    A. *The Lynn Plan* ........................................ 61
    B. *The State Laws at Issue* .............................. 62
    C. *The Plaintiffs* ...................................... 62
III. *LEGAL ANALYSIS* .............................................. 63
    A. *Threat of Irreparable Harm to Plaintiffs* ............ 63
    B. *Likelihood of Success on the Merits* ................. 64
        1. *Wessman Assumed Diversity Could be a Compelling* .... 65
        2. *Wessman Suggests that the Outcome is Fact–Bound* .... 65
    C. *Balance of Harms and the Public Interest* ............ 68
IV. *CONCLUSION* .................................................. 69

The plaintiffs, five parents of students residing in Lynn, Massachusetts, challenge the validity of "A Voluntary Plan for School Improvement and the Elimination of Racial Isolation" ("Lynn Plan") in effect in the Lynn School District, as well as the "use of racial balancing as a pre condition [sic] for the receipt of any form of state education aid."

The defendants are the Commonwealth of Massachusetts, the city of Lynn, the Lynn School Committee, and the following local Lynn officials who are sued in their official capacities only: the Mayor of Lynn, the Superintendent of the Lynn Public Schools, and each member of the Lynn School Committee.[1]

The Lynn Plan is essentially a plan for neighborhood schools. Any child may attend a neighborhood school without interference by any school official. It is only when a student applies to transfer *out* of a neighborhood school to another school in the district that the plan takes race into account.[2] A student's ability to transfer out of a neighborhood school may be limited if the transfer has the effect of increasing racial isolation or racial imbalance, as defined by the plan. Moreover, the implementation of the Lynn Plan qualifies the Lynn Public Schools for certain additional educational aid from the Commonwealth of Massachusetts. Plaintiffs challenge the plan itself and the state statute which conditions these funds on its implementation.

The plaintiffs argue that the consideration of race (both in the transfer policy and in state laws regulating the distribution of state education funding) violates the constitutions of the United States and Massachusetts, as well as various federal and state statutes.[3] They seek a preliminary injunction invalidating the plan and enjoining the operation of the state laws pending the outcome of litigation. For reasons which I explain below, I **DENY**

---

1. The United States has also submitted a brief as *amicus curiae.*

2. The Lynn Public Schools constitute a single school district. That district is further divided into attendance zones also referred to as districts. Students are assigned to their "district" schools but may also request transfers to "out-of-district" schools. The term "out-of-district" school is misleading as these schools are still within the same school district. For the sake of clarity, I will refer to a "district" school as a "neighborhood school" and "out-of-district" schools as "non-neighborhood" schools.

3. They argue that the defendants have violated the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 2000d, Article 111 of the Amendments to the Massachusetts Declaration of Rights, and MASS. GEN. LAWS ch. 12, § 111.

plaintiffs' application for a preliminary injunction. Plaintiffs cannot show any threat of irreparable harm, and as the record stands now, their likelihood of success on the merits remains unclear. Plaintiffs have indicated that they will *not* be seeking transfer requests in the upcoming assignment process. Even if the transfer policy were clearly unconstitutional, the plaintiffs face no threat of any harm from the plan's continued operation. Nor can they show the likelihood of success on the merits.

While there has been a rising tide of litigation challenging government use of racial classifications and preferences, both in and outside the school context, plaintiffs' challenge sweeps far more broadly than most, and—at least on this abbreviated record—too far. Although courts have become increasingly suspect of programs and policies that involve racial classifications, it cannot be said—as the plaintiffs do—that *any* government consideration of race in devising school assignment policies is unconstitutional. The answer is "it depends." It depends upon the actual operation of the plan, the context in which it is administered, and the purposes it serves.

Without an evidentiary hearing, without the development of the facts, I cannot forecast that the plaintiffs are likely to succeed on the merits.

Indeed, on May 11, 2000, the Second Circuit, facing a nearly identical issue involving a race-conscious transfer policy, decided precisely as I do now. *See Brewer v. The West Irondequoit Central School District,* 212 F.3d 738 (2nd Cir.2000). (This decision has been called to the Court's attention in the course of writing this opinion.) In *Brewer,* the court vacated a District Court decision granting a preliminary injunction. It noted that there were serious questions as to whether

the plan's goal of reducing racial isolation was sufficiently compelling to justify a race based classification. *Id.* (publication page references not yet available). While the decision is based in part on Second Circuit precedent not binding on this Court, the Second Circuit also found cases such as *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) and *Wessmann v. Gittens,* 160 F.3d 790 (1st Cir.1998) distinguishable from cases similar to the one before this Court—elementary and secondary school transfer policies that do not deny a benefit altogether to the complaining party because they offer an "equivalent alternative education," *id.,* cases about transfers or assignments not admissions or rejections.[4]

## I. STANDARD FOR GRANTING A PRELIMINARY INJUNCTION

As this Court has previously stated,

A preliminary injunction is an extraordinary equitable remedy. It requires intervention by the Court on an emergency basis, without the usual careful procedures and litigation methods—the exchange of information in discovery, evidentiary hearings, the full and complete briefing of the issues. As such the law imposes on plaintiffs the substantial burden of convincing the Court that they are likely to succeed ultimately and further, that if emergency relief is not granted, they will be 'irreparably' harmed.

*Boston's Children First v. City of Boston,* 62 F.Supp.2d 247, 253 (D.Mass.1999) (citations omitted). The test is a four part one:

The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibit-

---

4. The Second Circuit also criticized much of the *dicta* in *Wessmann* that discounted Supreme Court precedent giving school authorities broad discretion to enact policies to promote integrated education. It noted that

*Wessmann* relied on inapplicable precedent dealing with what is constitutionally required, rather than what is constitutionally permissible. *Brewer,* 212 F.3d 738 (publication page references not yet available).

ed a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981) (citations omitted). While the "likelihood of success at trial is particularly influential in the preliminary injunction calculus," none of the four factors "should be slighted" in the analysis. *Cohen v. Brown University,* 991 F.2d 888, 903 (1st Cir.1993); *LeBeau v. Spirito,* 703 F.2d 639, 642 (1st Cir.1983) (citations omitted).

## II. FACTUAL BACKGROUND

### A. The Lynn Plan

The Lynn Plan was originally adopted in 1988 and has been amended several times, most recently in September of 1999. Under the plan, all students in the Lynn Public School system are guaranteed the right to attend their neighborhood school. Students may also request a transfer to a non-neighborhood school. The transfer is generally allowed, space permitting, except when it would increase racial isolation (too low a minority percentage) or racial imbalance (too high a minority percentage) in the particular schools involved.

The Lynn Plan defines racial balance as the condition in which a particular elementary school's white-minority ratio is within 15 percent of the white-minority ratio of the students in the school system, and in the case of a middle or high school, when the ratio is within 10 percent of the white-minority ratio of the students in the school system.

Transfers may be obtained freely between schools which are racially balanced. The Lynn Plan only applies to schools which are not racially balanced. Because each of the high schools in Lynn is racially balanced, the Lynn Plan does not apply at all to these schools. Students may transfer to non-neighborhood high schools without regard to their race.

Of the remaining schools in the district, only two of the five middle schools, and none of the elementary schools, are racially balanced. Transfers among the schools which are not racially balanced can be restricted because of race. For example, a white student attending the Harrington elementary school, which is 80% minority, generally cannot transfer out of the school because it would increase racial imbalance at the school. Similarly, a minority student attending the Lynn Wood elementary school, which is 81% white, generally cannot transfer out of the school because it would increase racial isolation. The most racially isolated and racially imbalanced middle schools would similarly restrict minority and white transfers respectively.

These schools, however, represent the extremes of the spectrum. Students attending all other schools are *always* eligible to transfer to at least one non-neighborhood school. For example, a white student attending any elementary school would always be eligible to transfer to the Harrington elementary school because it would decrease racial imbalance. Similarly, a minority student would always be eligible to transfer to the Lynn Wood elementary school because it would decrease racial isolation.

In addition, these transfer rules serve only as the starting point of the Lynn Plan. They are determinative of initial eligibility for transfer, but not necessarily determinative of the outcome of the request. The Lynn Plan allows parents to appeal a denial of a transfer request. Exceptions may be granted for hardships involving concerns about siblings attending the same school, safety, medical needs, and as of 1999, hardships resulting from day care situations and classification of biracial and multi-racial students under the plan. Also, if a transfer request is denied, school officials discuss alternative possibilities with the parents in an attempt to accommodate their concern, often eliminating the need to resort to the appeals process.

Once a student successfully transfers to a non-neighborhood school, the student is automatically reassigned to that school for the following year. If the school were to become oversubscribed, race would be considered in determining which students would be required to attend another school.

## B. *The State Laws at Issue*

■ The plaintiffs argue that MASS. GEN. LAWS ch.71 § 37D ("37D") "require[s] or encourage[s] and reward[s] the illegal and unconstitutional" Lynn Plan. However, it appears that plaintiffs have taken aim at the wrong target.[5] Section 37D is primarily concerned with providing substantive rights to students in Massachusetts schools to promote racially diverse schools. Specifically, § 37D provides white students attending schools with less than a 30% non-white student population (which § 37D defines as racially isolated schools) the right to transfer to any district school with more than a fifty percent non-white population (which § 37D defines as racially imbalanced schools). Conversely, non-white students have the right to transfer from racially imbalanced schools (as defined by § 37D) to racially isolated schools (as defined by § 37D).

Section 37D also contains a remedial mechanism. If space limitations prohibit a transfer under these circumstances, the school committee is required to submit a plan to the Board of Education detailing proposed changes so that the student seeking the transfer can be accommodated. The Board of Education may also impose a mandatory plan upon the school district, if the proposed plan does not meet with its approval.

Thus, § 37D deals with "plans" only as a form of redress when a student's substantive rights have been violated. The Lynn Plan is not a product of § 37D's remedial mechanism at all. Rather, it is a voluntary effort on the part of the school district to seek out additional state educational funding.

The plaintiffs' confusion stems from a series of other Massachusetts statutes, which, taken together with § 37D, comprise the Racial Imbalance Act. The Lynn Plan is designed to qualify the Lynn Public Schools for additional educational funding pursuant to the other provisions of the Racial Imbalance Act. *See* MASS. GEN. LAWS ch.15 § 1I (paragraphs 3,4,5, and 7 provide funding for transportation costs of student transfers, construction or renovation of facilities, magnet programs, and a specially created "Equal Education Improvement Fund").[6] While these other statutory provisions reference § 37D's definitions of racial isolation and racial imbalance, § 37D does not mandate, encourage, or reward the school district for the implementation of the Lynn Plan. In short, § 37D is not the current impetus behind the Lynn Plan.[7]

## C. *The Plaintiffs*

Five parents, each on behalf of his or her children, have joined to challenge both the Lynn Plan and the Commonwealth's consideration of race in disbursing education funds.

Rather than discuss each of their situations individually, I will simply summarize the important commonalities between them. Each parent has a child that at one point was denied a transfer request under the Lynn Plan. The denial of the transfer request took the race of the child into

5. To be sure, plaintiffs' apparent confusion about which statute is involved also cautions against issuing an injunction with respect to it at this time.

6. The Lynn Plan may also qualify Lynn for state funding for the creation of magnet schools or magnet educational programs un-

der MASS. GEN. LAWS ch.71 § 37I, § 37J. This is not entirely clear from the record before me, and neither party has addressed the issue.

7. Plaintiffs may well seek to amend their complaint to include challenges to these other statutory provisions.

account. However, all plaintiffs are now satisfied with their current school assignment. None has indicated that he or she will seek a transfer for the upcoming school year. Therefore, the Lynn Plan will automatically assign these students to their current schools for the next year. Finally, no plaintiff has come forward with any evidence that their current school assignment is vulnerable to change because of over-subscription to their particular school.

## III. *LEGAL ANALYSIS*

Because there is no evidence of harm to the plaintiffs occasioned by the continuation of the Lynn Plan, I start with that prong of the test.

### A. *Threat of Irreparable Harm to Plaintiffs*

■ Even if the plaintiffs were likely to succeed on the merits of their constitutional claim, granting the preliminary injunction would be unwarranted. There is absolutely no threat of irreparable harm.

The plaintiffs rely on case law indicating that any constitutional injury is irreparable harm.[8] Therefore, they argue that if they can show that the plan is probably unconstitutional, it must be enjoined. Plaintiffs overlook the requirement that they themselves must face an imminent threat of suffering that constitutional injury, regardless of the constitutionality of the plan as applied to other students.

Even if the consideration of race in the transfer request process were clearly unconstitutional, there is no threat of these plaintiffs suffering that constitutional injury. Therefore, there is no need to grant the preliminary injunction.

At oral argument, plaintiffs identified various forms of harm. Essentially, they can be characterized as three distinct types of injuries. First, there is the denial of a transfer request to a school of one's choice. Second, there is the denial of an equal opportunity to compete for a guaranteed seat at the school of their choice. Third, plaintiffs argue, there is the irreparable harm they are currently suffering because their race was taken into account in the process of determining their current school assignments.

With respect to the first two forms of injury, plaintiffs face no threat of harm. All plaintiffs are currently enrolled in their school of choice, and they will be automatically reassigned to their current school unless the school becomes oversubscribed. Plaintiffs have failed to produce any evidence that over-subscription will occur. This, coupled with plaintiffs' concession

---

**8.** Plaintiffs rely on *Murphree v. Winter,* 589 F.Supp. 374 (S.D.Miss.1984). I need not resolve whether any constitutional injury constitutes irreparable harm, because plaintiffs face no threat of suffering any injury at the hands of the plan, let alone a constitutional injury.

Plaintiffs also rely on *Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1023 (1st Cir.1981) for the proposition that a finding that a policy is "probably unconstitutional necessarily entails a decision as to the other preliminary injunction criteria as well." Their reading of the decision is unwarranted. The decision in *Planned Parenthood* was limited to the "particular circumstances of [the] case" and those circumstances are not present in this case. *Id.* In *Planned Parenthood,* the outcome of the decision would have had irreversible effects on both parties and the public. At stake was enjoining a Massachusetts statute that re-

stricted access to abortions. Enjoining the statute might have caused some women to have abortions that they might not otherwise have had, while not issuing the injunction might have prevented some women from having abortions that they otherwise would have had. It was necessary to resolve the merits of the claim to decide *which* effects to credit, which were unavoidable but lawful byproducts of the correct application of law, and which were harm to be averted.

In contrast, the Court's denial of the preliminary injunction in this case will not subject the plaintiffs to the harm they claim is both unconstitutional and irreparable—the denial of the ability to compete equally for a seat at the school of their choice.

Simply put, plaintiffs are not competing for seats in the upcoming school assignment process at all.

that no student will seek a transfer, eliminates any real threat of an inability to compete on equal footing for a seat at the school of their choice. If plaintiffs voluntarily choose not to play the transfer game, they can hardly argue that the rules will irreparably harm them.

With respect to plaintiffs' third argument—that they are continuously subject to irreparable harm because race was considered in determining their current school assignments—there simply is no legal support for it. The Judiciary is the branch of government dedicated to resolving concrete legal disputes. Not only are plaintiffs content with their current school assignments, but they have made no showing that their race will play any role in their school assignment in the near future—other than pointing to the theoretical possibility of over-subscription at their particular school. Mere theoretical possibility alone is not enough.

Injunctive relief is forward looking. Courts cannot order the dismantling of a policy or program without any showing that the challenged action will cause some future harm to these litigants. Past harm alone is not enough. *See Los Angeles v. Lyons*, 461 U.S. 95, 103, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) ("past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy.").

These considerations are not trivial, but go to the heart of the business of the Judiciary. They are the same "overriding and time-honored concerns" underlying the Article III standing requirements which keep "the Judiciary's power within its proper constitutional sphere." *Clinton v. City of New York*, 524 U.S. 417, 421, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998)(internal quotation marks and citations omitted).

Because plaintiffs have not brought forth any evidence that they will be subject to the very constitutional harm they claim is irreparable, a preliminary injunction is unnecessary.[9]

### B. *Likelihood of Success on the Merits*

■ In order for a party to succeed in obtaining preliminary injunctive relief, the record must enable a court to comfortably predict that the moving party is likely to prevail. Despite the rhetoric in plaintiffs' papers, that degree of clarity is simply not present at this stage in the litigation. The issues are far more complex, ill-suited to resolution without discovery, on affidavits and argument alone.

Plaintiffs rely primarily on the First Circuit decision in *Wessmann v. Gittens*, 160 F.3d 790 (1st Cir.1998).[10] In *Wessmann*, the First Circuit held that the admissions policy for entrance to the Boston Latin School—which granted preferences based on race—did not survive strict scrutiny. *Id.* at 800. Relying on *Wessmann*, plaintiffs assert that the use of racial classifications can never be justified by an interest in promoting a diverse student population. According to plaintiffs, no other possible justification exists for the Lynn Plan.

**9.** This fundamental problem with the plaintiffs' application for a preliminary injunction renders independent consideration of the merits of their arguments under Massachusetts law and other federal statutes unnecessary. Absent a threat of irreparable harm, there simply is no need to issue a preliminary injunction. While I do address the equal protection argument in this opinion, I do so in part to clarify the standard of review so that the remainder of the litigation process will be properly focused.

**10.** Plaintiffs also rely extensively on a Fourth Circuit decision, *Eisenberg v. Montgomery County Public Schools*, 197 F.3d 123 (4th Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 1420, 146 L.Ed.2d 312 (2000). In applying strict scrutiny, the court declared a similar transfer policy unconstitutional because it found that "racial balancing" was not "a narrow fit to achieve diversity." *Id.* at 132–133.

But the Fourth Circuit's conclusions in *Eisenberg* are different from the First Circuit's holding in *Wessmann*, and do not bind this Court.

Therefore, plaintiffs conclude that the Lynn Plan simply cannot survive strict scrutiny.[11]

Plaintiffs overstate the holding in *Wessmann*.

### 1. *Wessman Assumed Diversity Could be a Compelling Interest in Some Circumstances*

In *Wessmann*, the First Circuit explicitly declined to hold that a state's interest in diversity in the educational context could never justify the use of race based classifications:

> Again, let us be perfectly clear. We are aware that two of our sister courts of appeals have suggested that diversity may never constitute a compelling governmental interest sufficient to warrant race based classifications.... For purposes of resolving this appeal, however, we need not speak definitively to that vexing question.

*Id.* (citations omitted). Indeed, the court assumed, without deciding, that diversity "might be sufficiently compelling, in specific circumstances, to justify race-conscious actions." *Id.* at 796.[12]

### 2. *Wessman Suggests that the Outcome is Fact–Bound*

The plaintiffs' argument hinges entirely on a question of law—that avoiding racial isolation and promoting diversity are never permissible under *Wessmann*—regardless of the evidence of the importance of the program and how narrowly tailored the program is in achieving its objectives. *Wessmann*, in fact, turned on the insufficiency of the evidence with respect to these considerations.

Rather than pronouncing a categorical ban on racial classifications aimed at promoting diverse student populations, the Court focused only on the mechanics of the particular policy at hand, noting that "the devil is in the details." *Id.* at 798. ("we must look beyond the School Committee's recital of the theoretical benefits of diversity and inquire whether the concrete workings of the Policy merit constitutional sanction").

In effect, the policy at issue in *Wessmann* only marginally bumped up the percentage of minority student attendance and, therefore, had, at best, a slight impact on the diversity of the school population. While the First Circuit found that this slight impact was clearly insufficient to

**11.** I have focused on the challenge to the Lynn Plan because the state laws (which plaintiffs failed to correctly identify) are only implicated to the extent that the Lynn Plan is a product of the Commonwealth's encouragement or imposition. If operation of the Lynn Plan need not be enjoined, neither would the operation of any state law which required, encouraged or rewarded the adoption of the Lynn Plan. Defendants have identified numerous independent grounds for denying the application for a preliminary injunction against the Commonwealth. I need not address those arguments at this point given the plaintiffs' failure to demonstrate a likelihood of success on the merits with respect to the plan, and, more importantly, any real threat of irreparable injury absent the granting of the preliminary injunction. *See infra.*

**12.** Moreover, *Wessmann* did not address the argument made here. *Wessmann* involved the state's interest in diversity as that term was understood in *Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). *Bakke* was premised on assumptions about the unique contribution that people of one background or another would make to an institution of higher learning. *Id.* at 313–315, 98 S.Ct. 2733. That, to the plaintiffs, and to a degree, the *Wessmann* court, is impermissible racial stereotyping.

The diversity interest defendants argue here makes no assumptions about any groups' "unique contribution." Rather, it reflects a concern that elementary school children simply get used to being in classrooms with people different from themselves. In fact, it assumes that the more diverse a classroom is, the more likely students will learn that all people are different, no matter what their color or ethnic background. It is not a form of stereotyping, but a method to prevent the formation of stereotypes. This distinction is also discussed in the recent Second Circuit decision. *See Brewer*, 212 F.3d 738 (publication page references not yet available).

demonstrate the necessity of the policy to achieve a compelling state interest, it did not state that the showing of necessity could never be made.[13]

To be sure, the strict scrutiny standard imposes a very substantial burden on the defendants. *See Personnel Amd'r of Mass. v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)("racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only on extraordinary justification") (citations omitted). This Court will have to carefully scrutinize the record, and as in *Wessmann,* will not "allow generalities emanating from the subjective judgments of local officials to dictate whether a particular percentage of a particular racial or ethnic group is sufficient or insufficient [to achieve the policy's stated goals]." [14] *Wessmann,* 160 F.3d at 800.

But the height of the defendants' hurdle alone cannot be a sufficient basis for concluding that the plaintiffs are likely to succeed on the merits. The defendants have come forward with a variety of justifications for their actions, some of which were not even raised in *Wessmann.* Moreover, unlike the evidence in *Wessmann,* defendants have offered expert testimony, the affidavit of Professor Gary Orfield ("Professor Orfield"), premised in part on social science evidence, that the Lynn Plan is necessary to achieve the educational benefits of preparing students to live in a pluralistic society. Conversely, Professor Orfield states that abandoning the Lynn Plan will have "detrimental effects" which include an impact on minority students' academic achievement.

And his observations are not based on unsystematic observation of racially mixed classrooms. Rather, they are based on comparing estimates of the actual student populations of the Lynn schools (were the plan to be dismantled) with the fruits of social science research.[15] Because plaintiffs' focus has been misplaced, believing there to be a categorical prohibition of any race conscious plans, they have not offered any evidence in rebuttal.

Moreover, to the extent that the promotion of diverse student populations and the prevention of racial isolation were raised in *Wessmann,* they were raised in an entirely different context. What *Wessmann* makes clear, and what this Court has stated before, is that the validity of racial classifications is "entirely context specific." *Boston's Children,* 62 F.Supp.2d at 259 (citations omitted). Were this case to present a more similar factual scenario to *Wessmann,* I would not feel compelled to tread so lightly. However, in this case it is clearly unchartered territory.[16]

*Wessmann* involved: (1) a racial preference policy for entrance to a competitive academic institution where merit was a

---

13. The Court pointed to the slight decrease in the student minority population that would result if the admissions policy were abandoned for a strict merit-selection process. *Id.* at 798 ("[e]ven on the assumption that the need for racial and ethnic diversity alone might sometimes constitute a compelling interest sufficient to warrant some type of corrective governmental action, it is perfectly clear that the need would have to be acute—much more acute than the relatively modest deviations that attend the instant case."; *see also id.* at 809 (Boudin, J. concurring))("The record shows that minorities will be included in BLS in substantial numbers without the plan [and that] if some specific higher level is needed to achieve diversity of views and backgrounds, this has not been demonstrated in the record").

14. *See also Wessmann,* 160 F.3d at 808 ("only solid evidence will justify allowing race-conscious action; and the unsystematic personal observations of government officials will not do, even if the conclusions they offer sound plausible and are cloaked in the trappings of social science").

15. Professor Orfield's conclusions stem not only from studying the concrete dynamics of the Lynn Plan, but also from studying Lynn's demographic make-up.

16. "The question of precisely what interests government may legitimately invoke to justify race-based classifications is largely unsettled ... [and] the case law offers relatively little guidance." *Wessmann,* 160 F.3d at 795.

criteria for admission; (2) a policy with little flexibility in that the formula determining the racial make up of fifty percent of the entering class did not allow for any consideration of individual student's situations; and, (3) the educational environment of a single institution not as intimately connected to a comprehensive district-wide plan aimed at improving the quality of education for all students in all district schools.

As compared to the Boston Latin School and other Boston public schools, the schools in the Lynn system are more fungible. Nothing indicates that one school is considered clearly superior to all others. While parents' subjective preferences for certain schools may be strong, there is no clear objective benefit to attending any one school over another. In this sense, the plan is merely race-*conscious* in deciding where students will be eligible to attend school, not race-*preferential* in deciding which students may attend better schools.[17]

Moreover, no merit issues are involved. The policies do not grant preferences to students of one race who are objectively less qualified than students of other races. Unlike many challenged race-based programs, more qualified applicants are not excluded from access to a scarce resource or benefit. No one is excluded from participating in the benefit; all students attend a school.

The Lynn Plan is also limited in scope. Prior to the adoption of the plan, students were simply assigned to their neighborhood school. Students are still guaranteed a seat at their neighborhood school. Race is considered only if students seek to transfer to a non-neighborhood school. The very ability to choose a non-neighbor-

hood school was made possible by the Lynn Plan.

The Lynn Plan is also flexible. No student is forced to transfer against his or her will. While race is considered in the process, it is not necessarily determinative. The defendants analyze students' particular situations on an individualized basis for determining the merit of a hardship appeal. Also, defendants meet with parents to see if their individual concerns can be satisfied with an alternative plan prior to resorting to an appeals process.

Whether these contextual differences will be sufficient to alter the outcome of the strict scrutiny analysis is an open question.[18] "[D]etermining whether the Plan at issue is narrowly tailored to accomplish [the compelling interest] pivots not merely on the fact that race is used in a school plan, but how it is used, in what settings, for what purposes, whether it is race conscious or race preferential, whether it involves an examination school for which there are significant qualifications, or an elementary school, for which there are not, whether the use of race excludes entirely or simply affects the distribution of a benefit, whether it is flexible, etc." *Boston's Children,* 62 F.Supp.2d at 259.

It is significant that *Wessmann* cites with approval *Wittmer v. Peters,* 87 F.3d 916 (7th Cir.1996), *cert. denied,* 519 U.S. 1111, 117 S.Ct. 949, 136 L.Ed.2d 837 (1997). *Wittmer* upheld the preferential hiring of African–American boot camp officers where the decision "rested on uncontroverted expert social science evidence . . . [and] limited its holding to the record before it, stating that if future academic research should show that its factual assumptions about boot camp discipline were unwarranted, race-conscious action would

---

**17.** An analogy comes to mind: Would there be a constitutional impediment to a school administrator assigning students to classes within a school building to maximize diversity to prevent black children from choosing one class, and white children choosing another.

**18.** Contextual differences *alone* may not suffice to survive the strict scrutiny analysis. As discussed previously, defendants will have to link the concrete workings of the Lynn Plan to reliable social science evidence.

be impermissible." [19] *Wessmann,* 160 F.3d at 795 n. 2. The First Circuit noted that the Seventh Circuit's decision in *Wittmer* "exemplifies the caution that this area of constitutional jurisprudence demands." *Id.*

This Court has chosen to heed the First Circuit's warning, and exercise the caution that is required. Before relief of the scope sought by the plaintiffs can be envisioned, there must be full and complete development of the facts and briefing of the law.

## C. *Balance of Harms and the Public Interest*

■ Neither of the two remaining factors alters the analysis. In balancing the respective harms, the scale clearly tips in favor of the defendants. Plaintiffs will suffer no harm if the Court does not grant the preliminary injunction. They will remain in the schools of their choice. In fact, granting the preliminary injunction could actually remove these students from their preferred schools. Most of the plaintiffs' assignments are to non-neighborhood schools. If Lynn were forced to redesign its school assignment plan, it is possible that student choice would be significantly restricted and could force plaintiffs to attend their neighborhood school—notwithstanding their preference.

Defendants would be harmed by the granting of a preliminary injunction. In addition to expending significant resources to re-design and implement a new school assignment policy, many of Lynn's educational projects funded by the state laws at issue would be placed in jeopardy. Moreover, disruption of funding for these educational projects throughout the Commonwealth would force the state to expend significant resources to continue to provide for the education of the affected students.

In addition, disruption of the entire school assignment policy has significant implications for the students who are not parties to this litigation. Some four thousand students currently attend non-neighborhood schools pursuant to the Lynn Plan. Were the Court to order the dismantling of the Lynn Plan, the seats of those students voluntarily attending non-neighborhood schools would be jeopardized.

Disrupting a student's continuous attendance at a particular school is recognized by all parties as harmful to a student's educational interests. Given the potential for a later Court order that further modifies the school assignment plan after trial, prudence surely cautions against granting an order causing such disruption now—when that disruption may prove to be either unnecessary or insufficiently corrective after a closer examination of the issue at trial.

Minimizing the number of potential disruptions to the educational process is surely in the public interest. Furthermore, waiting an additional year before implementing a new assignment policy will allow for more deliberation by the parties and the public on the various alternatives—and that deliberation will be more fully informed after a trial on the merits of a fully developed record. *See Capacchione v. Charlotte–Mecklenburg Bd. of Educ.,* No. 99–2389(L), slip op. at 4 (4th Cir. filed December 30, 1999) (Court of Appeals stayed district court order of injunctive relief, entered after a full trial, requiring the school to reassign students without respect to race, noting that "compliance would likely mean a neglect of individual student needs ...."). In *Capacchione,* the court of Appeals noted that "[i]f the race-based assignments do deny equal protection this would be a serious injury; however, we believe that *even so* the greater injury would stem from a hurried attempt to change current methods of pupil assignment ... [since] [s]uch a change requires

---

**19.** *Wittmer* permitted non-remedial race preferences in the employment context where considerations of merit play an essential role. *Wittmer,* 87 F.3d at 917 (permitting the hire of a black applicant who scored 42nd on the applicant's test over three white applicants who scored 3rd, 6th, and 8th on the same exam).

deliberation . . ." *Id.* at 5 (emphasis added).

Consideration of the remaining two factors of the preliminary injunction standard, the balance of harms and the public interest, only reinforces the Court's conclusion that preliminary injunctive relief is not warranted on the record before the Court.

## IV. *CONCLUSION*

I **DENY** the plaintiffs' request for a preliminary injunction because I find that: (1) plaintiffs have not shown that they are likely to succeed on the merits; (2) plaintiffs have failed to demonstrate any real threat of irreparable injury if the injunction is not granted; (3) plaintiffs will simply suffer no harm if the injunction is not granted while defendants will be forced to expend considerable resources to re-design a school assignment policy and avoid a disastrous halt to funding of educational projects on a state-wide basis; and, (4) granting the injunction prior to a trial on the merits of a fully developed record will only adversely affect the public interest.

In recognition of the important interests at stake, the parties are ordered to submit a schedule for discovery, motion practice, and an expedited trial.

**SO ORDERED.**